[611 NYS2d 835]

In the Matter of PACE UNIVERSITY et al., Respondents, v NEW YORK CITY COMMISSION ON HUMAN RIGHTS, Appellant, et al., Respondent.

First Department, May 5, 1994

## APPEARANCES OF COUNSEL

*Helen P. Brown* of counsel, New York City *(Larry A. Sonnenshein* and *John R. Low-Beer* with her on the brief; *Paul A. Crotty, Corporation Counsel* of New York City, attorney), for appellant.

*Marvin E. Frankel* of counsel, New York City *(Kevin B. Leblang* and *Robert I. Ruback* with him on the brief; *Kramer, Levin, Naftalis, Nessen, Kamin & Frankel,* attorneys), for respondents.

## OPINION OF THE COURT

Carro, J.

The New York City Commission on Human Rights appeals from an order and judgment (one paper) of the Supreme Court, New York County (Alfred Toker, J.), entered October 13, 1992, which granted the petitioners' motion to set aside in part the Commission's September 25, 1991 decision and order,

and denied the Commission's cross motion to enforce that decision and order. The portion of the decision and order that was set aside had found in favor of the complainant, Bette S.J. Mittleman, upon her charge that Pace University and the individual petitioners had retaliated against her, in violation of section 8-107 (7) of the Administrative Code of the City of New York, by denying her a teaching contract because she refused to withdraw a prior and pending complaint of gender discrimination against Pace and Dr. E. J. Mortola.

Administrative Code § 8-107 (7) provides that "[i]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies [here, employment] to retaliate or discriminate in any manner against any person because such person * * * filed a complaint * * * under this chapter [New York City Human Rights Law; Administrative Code, tit 8, ch 1]." The civil rights laws of the United States and the State of New York contain virtually identical provisions (42 USC § 2000e-3 [a]; New York Executive Law § 296 [7]).

Administrative Code § 8-123 (previously § 8-110) provides that a complainant or respondent may seek judicial review of a Commission order in the Supreme Court, and that the Commission's factual findings "shall be conclusive if supported by substantial evidence on the record considered as a whole" (§ 8-123 [e]). For reasons that follow, we disagree with and modify the Supreme Court's order and judgment, which set aside the subject portion of the Commission's decision and order upon finding insufficient evidence of retaliation under section 8-107 (7) of the Administrative Code.

Complainant, Bette S.J. Mittleman, received a B.A. in English from Adelphi University, and an M.S. in Business Policy (M.B.A.) from Columbia University in 1980. Petitioner Pace is a multicampus university with six degree-granting schools, including the Lubin Schools of Business (Lubin), and employs 500 full-time and 700 adjunct faculty. The individual petitioners (all of whom, including Pace, denominated "respondents" in the proceeding before the Commission) are Dr. E. J. Mortola, Pace's President from 1960-1987, currently retired with the title of Chancellor; Dr. Joseph M. Pastore, Jr., Lubin's Dean from 1976 until 1988, when he became Provost of Pace; and Dr. William G. Sharwell, who became Pace's President in 1987 when Dr. Mortola resigned.

In January of 1981, Ms. Mittleman was hired by Pace as a

full-time assistant professor in Lubin's Department of Management. It was understood that she would continue at that position for seven years, and would be considered for tenure in her sixth year. She subsequently signed full-time contracts at the same rank for each academic year from 1981-1982 to 1986-1987 as well as the fall semester of 1987.

In the fall of 1985 Ms. Mittleman applied for tenure, but after a complex review and appeal process, the details of which are not here pertinent, then-President Mortola advised her, by letter dated May 29, 1986, that Pace had decided to deny her tenure. Pace stated, and the Commission ultimately determined, that the reason Ms. Mittleman was denied tenure was her failure to obtain a Ph.D. or to complete any Ph.D.-level scholarly work. Upon receiving Dr. Mortola's letter, Ms. Mittleman accepted his offer, contained in the letter, to meet with him to discuss her status. At those meetings Dr. Mortola offered Ms. Mittleman a position of adjunct lecturer, pursuant to which she would teach half time at half her full-time yearly pay, on a year-to-year basis. Ms. Mittleman stated her willingness to accept the adjunct position, but requested that she be given a long-term contract in writing. Dr. Mortola responded that she was, in effect, asking him to give her tenure as an adjunct. By letter dated July 16, 1986 Dr. Mortola reiterated his offer of an adjunct appointment, noting that "such appointments must be on a year-to-year basis subject to the needs of the institution and a capacity of the faculty member to continue to carry the work assignment satisfactorily."

In January 1987 Ms. Mittleman filed a complaint with the Commission alleging that Pace and Dr. Mortola had denied her tenure on the basis of her sex, in violation of Administrative Code § 8-107 (1) (a). Ms. Mittleman completed her seven years of full-time teaching at Pace through the fall 1987 semester. In the spring of 1988 Ms. Mittleman began teaching as an adjunct lecturer, half time for half her previous full-time pay, pursuant to Dr. Mortola's July 1986 offer, and she continued teaching at that pay and position through the 1988-1989 academic year. Throughout this period Ms. Mittleman and Pace engaged in settlement discussions.

During the period October 1988 through February 1989, settlement negotiations begun in January 1988 had advanced to a point where Pace was offering Ms. Mittleman, *in exchange for her withdrawal of her sex discrimination complaint,* a five-year contract at a salary of $2,245 per credit hour (a 60% increase over her previous salary of $1,403 per

credit hour), renewable by Pace for up to five years based upon Ms. Mittleman's performance, including Pace's promise to give "favorable consideration to granting her the rank of Adjunct Professor Emeritus" in place of "Adjunct Lecturer." Dr. Sharwell's covering letter accompanying the final version of this proposed settlement agreement was dated February 1, 1989, and may be referred to hereafter as the February 1989 settlement offer, to distinguish it from the July 16, 1986 precomplaint offer of a standard adjunct teaching contract. On April 21, 1989 Ms. Mittleman's attorney, in a letter notable for its peremptory tone, responded to Pace's settlement offer as follows: "The rank of Adjunct Professor is acceptable. A five year term is not acceptable. A ten year term would be acceptable. The salary is acceptable. Salary adjustments at an Adjunct Professor's rank is not acceptable. Adjustments at an Assistant Professor's level would be acceptable. Six credit hours per season is not acceptable. Nine hours would be acceptable." This counteroffer letter went on in more or less the same curt "take it or leave it" manner with respect to other contractual terms. Pace elected to "leave it," but unfortunately withdrew not only its February 1989 settlement offer, but also foreclosed Ms. Mittleman from working as a teacher at Pace on *any* terms so ·long as her sex discrimination complaint remained pending.

■ On June 2, 1989 Dr. Pastore wrote Ms. Mittleman that "in consideration of the pending litigation," she would not be offered an adjunct faculty appointment for the 1989-1990 year. In full, the body of that letter stated:

"Since January 1988, you and the University have been unable to reach a settlement of your claim placed with the Human Rights Division of the State *[sic]* of New York. In particular, there was a failure to reach agreement on the adjunct faculty appointment offered since January 1988. Despite same, the University allowed you to continue to teach and provided you with compensation far in excess of that normally provided to adjunct faculty.

"Upon advice of counsel representing the University and in consideration of the pending litigation and the fact that we have been unable to obtain your agreement on the faculty appointment letter, I must inform you that the University is unable to offer you a faculty appointment for the 1989-90 year.

"I can appreciate your feelings upon receiving this news; I

assure you it is disappointing that our earlier discussions and those you had with Dr. Sharwell were not successful.

"Best wishes."

On July 11, 1989, Ms. Mittleman filed a second complaint with the Commission, this time charging Pace, Dr. Mortola, Dr. Pastore and Dr. Sharwell with retaliating against her for filing, or not withdrawing, the earlier sex discrimination complaint. Although the sex discrimination complaint was ultimately dismissed by the Commission, the retaliation complaint was sustained, and properly so.

It is evident that Dr. Pastore's statement in his June 2, 1989 letter, regarding the parties' inability to reach agreement on "the faculty appointment letter," referred to the February 1, 1989 letter from Dr. Sharwell that accompanied the final version of the proposed settlement agreement, the body of which read:

"I enclose four (4) copies of a slightly revised contract for your consideration.

"The changes are in accordance with our last discussion. This document now represents a proposal agreement that is in final form as far as we are concerned. I hope you agree.

"I will expect to hear from you."

There is no other "faculty appointment letter" in this record, and agreement of the parties on that letter, which accompanied the February 1989 settlement offer, required that Ms. Mittleman withdraw her sex discrimination complaint. Therefore the only reasonable construction of the June 2, 1989 letter is that Pace was "unable to offer [Ms. Mittleman] a faculty appointment for the 1989-90 year" because she refused to withdraw her sex discrimination complaint on the terms proposed by Pace.

Any doubt as to this interpretation is conclusively laid to rest by the facially alternative, but juridically identical ground stated in that letter, to wit: "in consideration of the pending litigation * * * the University is unable to offer you a faculty appointment for the 1989-90 year." This could only mean that since Ms. Mittleman brought a sex discrimination complaint, and refused to withdraw it, she would not be permitted to teach at Pace. At the hearing Dr. Pastore explained that what he meant by "in consideration of the pending litigation," "was that we were unable to reach agreement and we had reached a level of frustration in all of this, *and it was clear that Bette Mittleman wanted to proceed with*

*her litigation.* And so the likelihood that we would be able to sign her to an adjunct contract was essentially nonexistent and so we did not go forward and offer her a contract." (Emphasis added.)

The petitioners' brief makes Dr. Pastore's unusual explanation even more clear: "Ms. Mittleman had been offered a generous contract and refused to sign it. Pace decided that its choice was to offer her another contract with inferior terms, which Dr. Pastore was sure she would not sign, or not offer her any contract at all. Pace selected the latter option." Pace equivocates here between the "generous contract" (the February 1989 settlement offer) that Pace had offered in exchange for her withdrawal of her discrimination complaint, and the year-to-year adjunct contract which had not been tied to withdrawal of her complaint. How could Pace reasonably assume that because Ms. Mittleman refused to settle her discrimination complaint she would refuse to work part time as an adjunct pending resolution of her complaint? Such a supposition would constitute a non sequitur of the first order, and the Administrative Law Judge properly refused to accept that explanation.

As it turned out, Ms. Mittleman was shocked and devastated at Pace's decision not to offer her an adjunct contract. When in December 1989 such a contract was offered to her, she expressed in writing her willingness to sign it, and only refused to sign it when Pace later made clear that the offer of an adjunct contract, i.e., her continued employment, was conditioned upon her withdrawal of her complaint *(see, infra)*. Thus the one-sentence middle paragraph of the June 2, 1989 letter, reduced to plain language, conveyed the following to Ms. Mittleman: "Our lawyers have advised us that since you brought a discrimination complaint against Pace, and have refused to withdraw that complaint on our terms, you are not going to teach at Pace anymore." That constituted retaliation against Ms. Mittleman, prohibited by section 8-107 (7), as well as section 8-107 (1) (e), of the Administrative Code.

Although further evidence of unlawful retaliation is not necessary to support modification of the Supreme Court's judgment, it is patent in the record, and should be set forth. On July 20, 1989, Ms. Mittleman wrote to Dr. Mortola expressing her "great distress" over the precipitous collapse of the settlement negotiations, and appealed to him "to restore the mutual resolution of this matter." After extended oral

discussions, Dr. Sharwell responded by letter dated December 19, 1989:

"Confirming our conversation this week, I must tell you that I am unable to reinstate the contract offer which you did not accept last Spring.

"In the interest of equity and fairness, the University will offer you the same standard adjunct contract which has been extended to others who, over the years, have not been awarded tenure.

"While I understand your disappointment, I would hope that you find it possible to continue teaching at Pace University under the adjunct contract."

Dr. Sharwell did not place any conditions on this offer, essentially the same offer pursuant to which Ms. Mittleman had been teaching beginning in the spring of 1988, and Ms. Mittleman indicated her willingness to accept it by letter dated January 17, 1990.

No sooner had Ms. Mittleman so indicated, however, than Pace's counsel sent her a letter dated January 25, 1990 stating that the offer was *not* unconditional—rather, it was conditional upon her withdrawing her complaints against Pace:

"It is my understanding that you have agreed to settle your grievance against Pace in consideration of your appointment as an Adjunct Lecturer in the Lubin School of Business, for a term of one year at the rate of $1,450 per credit, subject to such other normal terms and conditions as are applicable to said appointment. This agreement may be renewed from year to year upon the mutual consent of both parties.

"In order to accomplish the above, it will be necessary for you to notify the Division of Human Rights in substance that you have settled your claim against Pace, and are desirous of withdrawing the complaint. Mutual general releases should be exchanged between you and Pace."

Ms. Mittleman replied by letter dated February 1, 1990 that her discussions with Drs. Pastore and Sharwell and Dr. Sharwell's December 19, 1989 letter were not in the context of withdrawal of her complaints with the Commission. She stated that she was "eager to continue" to teach at Pace, but that "your demand for withdrawal of my claim as a prerequisite of employment is wholly one-sided and therefore unacceptable." Since receiving the June 2, 1989 letter, Ms. Mittleman has not taught at Pace, and Pace thereafter never offered

her any contract that was not conditioned upon withdrawal of her complaints.

On March 29, 1991, following a five-day hearing, Administrative Law Judge Linda A. Stagno issued her recommended decision and order which rejected Ms. Mittleman's complaint of sex discrimination, finding that Ms. Mittleman was denied tenure because she lacked the requisite scholarly credentials, and that the statistical evidence "demonstrated an admirable record on the advancement and promotion of female faculty at Pace." However, Judge Stagno credited the above evidence of retaliation in findings of fact and conclusions of law, as follows (note that "respondents" at the Commission hearing are the petitioners in this review proceeding):

"In essence, the issue now presented is whether a withdrawal of employment made in the context of settlement negotiations can be viewed as discriminatory retaliation. This tribunal finds, on the facts of this case, that it was.

"The gravamen of a retaliation complaint is that the complainant has been penalized for pursuing protected activity, e.g. filing a discrimination complaint. At issue in most retaliation cases is the nexus between the protected activity and the adverse treatment. In this case, the relationship between the withdrawal of the adjunct contract and the protected activity is undisputed: complainant's ability to continue to teach at Pace, even in the adjunct position originally offered to her after her tenure denial but before she filed her complaint, was contingent on withdrawing her complaint to settle the lawsuit.

"The original adjunct contract offer * * * was made by Mortola 'on a year-to-year basis subject to the needs of the institution and a capacity of the faculty member to continue to carry the work assignment satisfactorily.' The record is devoid of any evidence tending to show that complainant's yearly adjunct contract was not renewed for either of those two stated reasons. Thus, in consideration of these requirements, the clear language of the June 1989 letter, and respondents' position at hearing that the adjunct position was withdrawn as a result of the failure of settlement negotiations, this tribunal concludes and so finds that the withdrawal or failure to renew complainant's contract was retaliatory.

"Moreover, this tribunal does not view the finding of retaliation as a message to litigants to refrain from settlement negotiations, nor does it believe that such a holding will chill efforts at conciliation. Had complainant been placed in the

same position she was offered prior to filing her complaint, she could not now be heard to complain. However, once respondents changed the adjunct position's renewal requirements from the 'needs of the institution' and 'capacity of the faculty members to continue to carry the work assignment satisfactorily' to withdrawal of complainant's discrimination complaint, they impermissibly retaliated against her. Had the negotiations been successful, complainant would most likely have been awarded a contract and the complaint would have been withdrawn. Had the negotiations broken down and complainant been placed in *status quo ante* vis-a-vis the adjunct contract, there would not have been retaliation. Thus, the real culprit here was not the intervening settlement attempt; the problem was respondents' adverse treatment of complainant based on her having filed a complaint, and not based on the changed needs of the institution or complainant's unsatisfactory performance."

The Commission adopted Judge Stagno's findings of fact and conclusions of law, modifying only in respect to the remedies imposed. Petitioners then commenced the underlying proceeding to set aside the Commission's finding of retaliation, by seeking review pursuant to CPLR 7803 (4) and section 8-110 (since renumbered section 8-123) of the Administrative Code. Under either statute the standard of review is whether the Commission's determination was, on the entire record, supported by substantial evidence, which the Court of Appeals has described as "such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact" *(300 Gramatan Ave. Assocs. v State Div. of Human Rights,* 45 NY2d 176, 180). It is "less than a preponderance of the evidence," and a practical test "is found in measuring the evidence against the standard of sufficiency such as to require a court to submit it as a question of fact to a jury" *(300 Gramatan Ave. Assocs. v State Div. of Human Rights, supra,* at 180, 181)

As previously noted, the Federal civil rights statute proscribing retaliation (42 USC § 2000e-3 [a]) and Administrative Code § 8-107 (7) are virtually identical, and we may accordingly look to Federal cases for a description of the elements of unlawful retaliation. Thus, to establish a prima facie case of retaliation a complainant must prove (1) participation in protected activity known to the alleged retaliator, (2) an employment action disadvantaging the person engaged in the protected activity, and (3) a causal connection between the

protected activity and the adverse employment action *(Johnson v Palma,* 931 F2d 203, 207 [2d Cir 1991]; *Bigge v Albertsons, Inc.,* 894 F2d 1497, 1501 [11th Cir 1990]; *DeCintio v Westchester County Med. Ctr.,* 821 F2d 111, 115 [2d Cir 1987], *cert denied* 484 US 965).

Petitioners do not deny that by instituting her sex discrimination complaint with the Commission Ms. Mittleman was engaged in protected activity that was known to the petitioners, or that their refusal to offer Ms. Mittleman a teaching contract constituted an adverse employment action. The only prong of a prima facie retaliation case that the petitioners dispute is the causal connection between the termination of Ms. Mittleman's employment and Ms. Mittleman's refusal to withdraw her sex discrimination complaint. Clearly, there was sufficient proof in the record to support a reasonable conclusion that there was a causal connection between the two events, and it is equally clear that the evidence was "such as to require a court to submit it as a question of fact to a jury," two of the formulations described in *300 Gramatan Ave. Assocs. v State Div. of Human Rights* (45 NY2d, *supra,* at 181). Needless to say, the evidence was in fact overwhelming, in view of the documentary evidence submitted—in particular the letters dated June 2, 1989 and January 25, 1990—that the petitioners' refusal to offer Ms. Mittleman a faculty appointment for the 1989-1990 year and thereafter constituted retaliation for her refusal to withdraw her sex discrimination complaint before the Commission.

The dissenters' observation that the record contains evidence from which it could be deduced that "complainant's termination was based on substantial reasons other than supposed retaliation" completely misperceives the court's lawful function in a CPLR article 78 proceeding to review the determination of an administrative agency made after a hearing. We examine the record to see if there is "substantial evidence" to *support* the findings of the body or officer (CPLR 7803 [4]); we may *not* seek out contrary evidence, proceed to weigh the total evidence, and then make our own factual findings *(Matter of Pell v Board of Educ.,* 34 NY2d 222, 230-231; *Matter of Colton v Berman,* 21 NY2d 322, 329; *Matter of Shell Cr. Sailing Club v Board of Zoning Appeals,* 20 NY2d 841, 844). We note in this regard that the unflattering portrait of Ms. Mittleman painted by the dissenters bears little if any resemblance to the Administrative Law Judge's favorable description of her teaching abilities and her positive attitude

toward Pace and her students. The record is replete with testimonials supporting the Administrative Law Judge's evaluation of Ms. Mittleman, including those of Tony H. Bonaparte, then Dean of the Lubin Schools of Business ("she is a superb teacher * * * performance has been outstanding") and Walter E. Joyce, then Associate Dean for Faculty and Academic Affairs ("a dedicated and popular teacher * * * actively engaged in Departmental, Lubin and University affairs * * * serves as a role model").

■ Petitioners argue that the admission into evidence of the June 2, 1989 letter was error because Administrative Code § 8-119 (d) provides that "[e]vidence relating to endeavors at mediation or conciliation by, between or among the commission, the complainant and the respondent shall not be admissible." That particular argument was not made before the Administrative Law Judge, probably because the hearing commenced on May 30, 1990, and the section was not enacted and made effective until more than a year later (September 16, 1991). In any event, when the letter was offered as a Commission exhibit, petitioners' counsel stated: "We have no objection to it." Thus any potential objection was waived (Richardson, Evidence § 537 [Prince 10th ed]).

But even assuming arguendo that when the petitioners said they had "no objection" to the letter they were by some feat of legal legerdemain preserving their objection to its admission into evidence, that letter was strong evidence of retaliation, not an offer of mediation or conciliation. The documents that demonstrated the parties' efforts at settlement were all introduced by the petitioners. Neither the facts nor the legal principles articulated in *Bigelow-Sanford, Inc. v Specialized Commercial Floors* (77 AD2d 464) lend the slightest support to the dissenters' argument that the June 2, 1989 letter was excludable as an offer of mediation or conciliation. In that case Bigelow, a carpet manufacturer, sold carpet to Specialized, a carpet installer, for a customer, JCC. When the carpet showed defects after installation in JCC's premises, the manufacturer and installer each blamed the other; so JCC sued the manufacturer for breach of warranty, and the manufacturer and installer brought suit against each other. The manufacturer settled with JCC by replacing the carpeting, and the installer sought to introduce that settlement into evidence as an implied admission by the manufacturer that the carpet was defective. The Appellate Division affirmed the Trial Judge's ruling excluding the evidence, applying the long-famil-

iar principle that " 'an offer of compromise, *which contains no express admission of fact,* is not admissible in evidence against the maker * * *' *(Union Bank of Brooklyn v Deshel,* 139 App Div 217, 219; emphasis added)." *(Bigelow-Sanford, Inc. v Specialized Commercial Floors,* 77 AD2d, *supra,* at 465.) Thus even if the common-law rule governed, the letter would have been admissible as an express admission of fact, to wit, the nexus between the protected activity and the adverse treatment.

The repeated characterizations in the dissenting opinion of Ms. Mittleman's 1987 discrimination complaint as "meritless" are irrelevant with respect to the only issue before us, which is whether there was substantial evidence to support her 1989 retaliation complaint. As the court stated in *Cohen v Community Coll.* (484 F Supp 411, 429 [ED Pa 1980]): "The fact that I have decided plaintiffs' underlying charge of racial discrimination in defendant's favor is of no consequence to the retaliation claim. It is well established that even when a charge of discrimination is without merit, an employee or applicant is still protected by Title VII in making the charge, and he may not be retaliated against [citations omitted]."

Nor is there merit to the dissenters' suggestion that Pace would have been in a more advantageous position if it had terminated Ms. Mittleman at the end of her existing appointment, upon denial of her application for tenure, and that all future denials of tenure should be accompanied by termination. Implicit in this "advice" is that Pace could then have refused to hire Ms. Mittleman unless she withdrew her sex discrimination complaint, which purportedly would not have constituted retaliation, but rather bargaining toward a settlement. That is not the law, for it is well settled that an employer cannot refuse to hire an employee because the employee has filed a discrimination charge.

Thus, the dissent is incorrect when it asserts, with respect to Pace's renewal of Ms. Mittleman's yearly adjunct position, that "It could reasonably be contemplated that as a logical adjunct to a new employment agreement, complainant would be expected, as a matter of course, to have withdrawn her sex discrimination complaint." In *Kirkland v Buffalo Bd. of Educ.* (487 F Supp 760, 772 [WD NY 1979], *affd* 622 F2d 1066 [2d Cir 1980]), the court made this perfectly clear, applying Title VII of the Civil Rights Act of 1964 (42 USC § 2000e-3 [a]) the analogue to Administrative Code § 8-107 (7): "I find that Mr. Kirkland was denied the second appointment because the list

expired before a recommendation to appoint him was submitted to the Board, and that delay in submitting the recommendation occurred solely because of the elapsed time required to demand, unlawfully, and to receive, a withdrawal of protected complaints of discrimination. However natural it may be for an employer to be reluctant to hire someone who has brought suit against him, it is every citizen's right to resort to the judicial system, and Title VII makes illegal an employment decision based on [an] applicant's exercise of this right as it applies to actual or perceived employment discrimination. Essentially, this is retaliation". *(See also, East v Romine, Inc., 518 F2d 332, 342 [5th Cir 1975]:* "Title VII would be chilled to a freeze by allowing the icy finger of job discharge or refusal to touch an individual who claims his Title VII rights. The resort to legal rights cannot itself legalize discrimination. * * * [E]vidence of the plaintiff's prior litigation could not be used as a basis for refusing to hire her.")

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Alfred Toker, J.), entered October 13, 1992, which granted the petitioners' motion to set aside in part the Commission's September 25, 1991 decision and order, and denied the Commission's cross motion to enforce that decision and order, should be modified, on the law, with costs, and the Commission's decision and order reinstated, except for the provision requiring petitioners to submit to the Administrative Law Judge and the Commission's Law Enforcement Bureau "a staff education plan outlining how it intends to curtail retaliatory practices." There was no evidence or finding of other incidents of retaliation, and thus no "retaliatory practices" that require a staff education plan. The Commission's cross motion to enforce that decision and order is granted, as so modified.

WALLACH, J. (dissenting). On or about January 29, 1987, almost six years to the day after she commenced her employment as a nontenured assistant professor at the Lubin Schools of Business at Pace University, Ms. Bette S.J. Mittleman filed a complaint with appellant Commission on Human Rights, charging Pace and its Chancellor with unlawful discrimination arising from alleged gender bias against her. The only specifications of the charge were set forth verbatim as follows:

"A. In or about the middle of June 1986, I learned that Dr. E. J. Mortola, Chancellor, who is a male, denied me tenure. The reason given to me for denying me tenure was that I do not possess a PhD.

"B. Upon information and belief, there are two (2) similarly situated male employees who have been granted tenure and do not possess Ph.Ds."

Two years of intensive contract negotiations followed. When complainant declined to accept the final, negotiated, good-faith offer, the University informed her in June 1989 that her services would be terminated. Complainant then filed an amended complaint the following month, charging unlawful discrimination by way of retaliation.

In May-June 1990 a five-day hearing took place before Administrative Law Judge (ALJ) Linda A. Stagno, whose lengthy recommended decision and order dismissed this complaint as entirely lacking in merit. After exhaustive consideration of every grievance advanced by complainant, the ALJ found, *inter alia:*

"Respondents [Pace and its officers] presented credible and sufficient evidence of non-discriminatory reasons for Complainant's tenure denial. Essentially, Respondents denied Complainant tenure because she did not have a Ph.D., had not performed any scholarly research, and would not have enhanced Pace's chances of getting AACSB accreditation. The evidence at hearing established that Complainant's tenure application went through Pace's multi-step process and there was *no evidence to suggest that the process was tainted or that gender played any role* in her tenure consideration. * * *

"Further, the statistics offered by Respondents through [Dean] Pastore also demonstrated *an admirable record on the advancement and promotion of female faculty at Pace,* while Complainant's statistics were inconclusive. Thus, we find that Pastore's actions regarding Complainant's denial of tenure were in no way gender-based and were, therefore, non-discriminatory.

"In sum, Respondents' *[sic]* successfully rebutted Complainant's case and proved, by a preponderance of evidence, that the *tenure denial was not discriminatory.* Complainant failed to demonstrate that Respondents' stated reasons were pretextual. Therefore, that complaint must be dismissed." (Emphasis added.)

Interestingly, it developed at the hearing that complainant's male predecessor had been denied tenure for the very same reason, namely, lack of a Ph.D. or other "terminal degree," and the absence of any equivalent evidence of scholarship.

Unfortunately for Pace, this sweeping victory on the core

issue in the case proved to be as illusory as Napoleon's in the Battle of Borodino. Pace's startling reversal of fortune came about when the ALJ went on to hold that a letter from Pace's Provost, Dr. Joseph M. Pastore, Jr., to complainant on June 2, 1989, constituted a retaliatory discharge for her filing of what had just been held a meritless complaint, and that other written exchanges between the parties buttressed that conclusion. The final order issued by the Commission on September 25, 1991, which the majority would reinstate, awards the sum of $4,000 (double the sum recommended by the ALJ) for emotional distress, and directs "front pay" commencing for the 1991-1992 school year "until such time as Complainant's reinstatement."

There is no dispute that all adjunct appointments such as complainant's are normally tendered in standard written form with a one-year term, and that they contain an express disclaimer of renewal or tenure rights. Thus complainant, if this order ultimately stands, has achieved through the back door that for which she has been lawfully disqualified, and what no nontenured appointee has ever received at Pace, namely, either lifetime tenure (since only a foolhardy administrator might contend that the "retaliation" umbrella fashioned by the Commission for complainant would disappear with time), or, if there is no teaching assignment for her at Pace, a lifetime annuity. It was doubtless these circumstances which led the motion court to describe the order as "illogical and illegal", resulting in its vacatur and this appeal by the Commission.

Concededly, if the outcome of this case were to turn solely on a construction exercise upon Dr. Pastore's June 2, 1989 letter (as we sometimes must do with a layman's kitchen table will containing contradictory provisions), the majority's conclusion might carry some weight. But in my view, the task placed before us is not so narrow. The June 2nd letter does not stand in total isolation, but must be viewed as merely the latest step in a tortured series of "sporadic settlement negotiations" which reached a climax of sorts with the filing of the July 1989 complaint. Those negotiations consistently encompassed two elements: (i) agreement on an acceptable employment agreement short of full tenure, and (ii) withdrawal of her 1987 complaint with the Commission. The ALJ even found that "[h]ad the negotiations been successful, Complainant would most likely have been awarded a contract and the complaint would have been withdrawn." Complainant herself

acknowledged this. On July 20, 1989, after receiving Dr. Pastore's termination letter, complainant wrote to Chancellor Mortola, recounting that she had "further subsequently stated my intention to withdraw immediately my complaint with the New York City Human Rights Commission, upon joint execution of the Agreement." She even offered in the letter to withdraw her amended charges of retaliation. Complainant similarly acknowledged at the hearing that "as part of this settlement proposal agreement * * * it was * * * understood that [she] would take steps to dismiss the proceeding filed with th[e] Commission". Even Commission counsel had "no problem stipulating that at one point an agreement might have been acceptable and might have ended this case, which included a withdrawal of the claim here."

Further evidencing complainant's intent to include a withdrawal as part of a global settlement, her private counsel, in his settlement negotiations, never questioned the provision proposed by Pace requiring withdrawal of the discrimination complaint. There is also Commission counsel's stipulation that complainant's private counsel had agreed to a provision requiring withdrawal of the discrimination complaint. And the University's officers evidenced the same understanding of the settlement discussions which were reduced to writing "in final form" in the proposed, revised contract forwarded to complainant on February 1, 1989. The sixth of the eight numbered paragraphs in that agreement read as follows: "Mittleman agrees within five (5) business days of the execution of this agreement to take any and all steps necessary to withdraw her complaint and discontinue the aforementioned proceeding filed with the Commission on Human Rights for the City of New York."

Responding to this offer, complainant called President Sharwell and told him, cryptically, that she was "neither signing it nor rejecting it." Confronted with this enigma, President Sharwell wrote back on February 23, 1989, stating the employment offer would remain open until March 1, but not thereafter. When complainant remained silent, the purportedly fatal letter of June 2, 1989 followed, which in this context of elementary contract law should be regarded as mere surplusage, without legal force or effect.

Within this same contractual context the ALJ made the following finding which is uncritically accepted by the majority: "The original adjunct contract offer [July 16, 1986] was made by Mortola 'on a year-to-year basis subject to the needs

of the institution and a capacity of the faculty member to continue to carry the work assignment satisfactorily.' *The record is devoid of any evidence tending to show that complainant's yearly adjunct contract was not renewed for either of those two stated reasons.* Thus, in consideration of these requirements, the clear language of the June 1989 letter, and Respondents' position at hearing that the adjunct position was withdrawn as a result of the failure of settlement negotiations, this tribunal concludes and so finds that the withdrawal or failure to renew Complainant's contract was retaliatory." (Emphasis added.)

The error of law in this finding is apparent. It establishes an erroneous premise that this "offer" gave complainant a special status enjoyed by no other adjunct appointee of Pace: that in the absence of affirmative proof by Pace of either (i) a change in Pace's "needs," or (ii) complainant's incapacitation, a modified form of tenure had been extended to her. But this idea is conclusively refuted by the express language contained in the contracts theretofore signed by complainant and every other Pace adjunct: *"No right or expectation of renewal exists by reason of this [adjunct] appointment unless the Faculty Member has been granted tenure."* That is definitive of complainant's status in June 1989. Clearly, Dr. Pastore's letter cannot be read as enlarging the plain language of the contract complainant signed on May 15, 1986 and in succeeding years. Its language is advisory in content, and restrictive rather than expansive. Thus, instead of any supposed renewal "entitlement" on June 2, 1989, she was simply a year-to-year employee terminable at will at the expiration of the annual term *(Sabetay v Sterling Drug,* 69 NY2d 329; *Murphy v American Home Prods. Corp.,* 58 NY2d 293). Complainant's nonrenewal after her tenure denial was pursuant to this long-vested and consistently reaffirmed employer's contractual right, unencumbered by any necessity by Pace to establish the existence of other burdensome conditions.

With the jural relationship of the parties in June 1989 placed in proper focus, we must now ask whether the record contains any *competent* evidence to support the conclusion that in the exercise of its unfettered contractual right to decline renewal, Pace committed "retaliation" within the meaning of section section 8-107 (7) of the Administrative Code of the City of New York. On this record, the answer must be *No.*

A mandated function of the Commission is to encourage the parties to settle cases. Rules 24 through 26 of the Commission's Rules of Practice implement this function. Rule 26, entitled "Non-disclosure of offers of settlement or conciliation," provides that "[t]he Commission shall not disclose offers of settlement or conciliation made by the parties." (47 RCNY 1-04 [c] [1991].) Similarly, section 8-119 (d) of the Administrative Code provides that "[e]vidence relating to endeavors at mediation or conciliation by, between or among the commission, the complainant and the respondent shall not be admissible." While this provision only became effective on September 16, 1991, it should be retroactively applied because it is remedial in nature *(Matter of Hynson [American Motors Sales Corp.],* 164 AD2d 41, 48), and in any event merely restates the common-law rule *(see, Bigelow-Sanford, Inc. v Specialized Commercial Floors,* 77 AD2d 464). The suggestion by the majority that the June 2, 1989 letter consists of an admission of fact is simply untenable. It is wholly and manifestly the exposition of a negotiating position.

Pace's objection to the introduction of this letter was preserved by timely motion to dismiss the retaliation claim and bar introduction on the ground that settlement discussions are inadmissible. Thus, there was no need to renew the objection at the hearing which commenced just six days later. Nor is there any reason to consider the objection waived. In Pace's counsel's opening statement, he noted "the Commission's policies favoring settlement[, that t]he university complied with those policies in earnest good faith * * * [and that] settlement negotiations, as a matter of general law, should be privileged". While counsel stated that he had "no objection" to the admission of the June 2 letter, the colloquy makes it clear that Pace only waived its objection to the fact that the exhibit shown to the witness was an unsigned copy and not the actual letter she had received. Even if the June 2 letter was properly admitted, it does not establish a causal connection between the protected activity and the alleged mistreatment *(see, De-Cintio v Westchester County Med. Ctr.,* 821 F2d 111, 115, *cert denied* 484 US 965). Read in context, the letter clearly suggests that Pace's inability to offer complainant a faculty appointment for the forthcoming academic year was the result of the parties' inability to agree on the terms of a contract, rather than retaliation for her refusal to withdraw her discrimination complaint. (Nor, for that matter, did the parties' continuing correspondence toward settlement, in late 1989

and early 1990, lend any further support to complainant's claim of retaliation.)

Complainant's contention that her announcement to Dean Bonaparte, who hired her as an adjunct, to the effect that she had no intention of taking any steps in pursuit of a Ph.D. degree, somehow immunized her from this tenure requirement is without merit. Enlargement of the doctoral faculty was no trivial issue with Pace, whose hopes for the accreditation of its Lubin Schools of Business lay in increasing the ratio of Ph.D.-qualified faculty to the student body. Complainant's declaration was much like the high school freshman who proclaims that he/she does not "like" or "do" geometry. After absorbing such news, no school could be faulted for coming down on the side of Euclid, and no one could say that the school was thereby estopped from giving the child a flunking grade. The same may be concluded with respect to complainant's denial of tenure and ultimate dismissal based, *inter alia,* on her complete lack of scholarly writing.

Early on, complainant's immediate superior, Professor Varanelli, and her department head, Professor Baugher, became aware that she "did no scholarly research and did not publish any articles or works of any kind" (ALJ finding No. 8). They resolved to help her, and created a topic for her: a survey of how former Pace students who majored in International Management were faring in their careers. When complainant floundered, they furnished a graduate student, skilled in computer work, to assist her. When she failed to produce anything after the survey responses came back, she complained that the help provided was inadequate. When that excuse did not find acceptance, she claimed that the survey responses, if reported, would be embarrassing to Pace. Apparently it never entered her mind that negative responses might provide the basis for constructive recommendations valuable to Pace—a probable reason for the survey in the first place.

At the ALJ hearing it developed that complainant was anything but satisfied with the help of her colleagues. She accused both Varanelli and Baugher of having politically incorrect artwork in their respective offices, an accusation rejected by the ALJ. She also attempted to put in the mouth of another senior official at Pace a disparaging remark about her living at Sutton Place, and therefore not needing a permanent appointment. The ALJ rejected this as a fabrication.

Professor Baugher was the chair of the first committee to

review complainant's tenure application, which voted it down. In her deposition, complainant testified to her belief that Baugher had "hang-ups" with women. Cross-examined on this at the hearing, she fenced with counsel but essentially confirmed her earlier testimony. This stance reflects complainant's tendency to reduce her tenure denial to the level of personal bias without any basis for such an attack. Perhaps worse, it demonstrates that whenever complainant is caught in a shortcoming, the blame must always be placed at someone else's door.

Thus, the record is replete with evidence that complainant's termination was based on substantial reasons other than supposed retaliation.

Wholly apart from the evidence indicating a nonretaliatory termination, the dismissal of complainant's retaliatory discharge claim must follow as a matter of law. Without the June 2 letter and other correspondence, there is no substantial evidence to support the retaliation charge, and therefore the order of the Commission must be vacated on this ground *(Burlington Indus. v New York City Human Rights Commn.,* 82 AD2d 415, 417, *affd* 58 NY2d 983). The Commission's determination may be said to be arbitrary inasmuch as it was reached in violation of the agency's own rules, as well as settled law.

The notion that Pace's insistence on withdrawal of the sex discrimination complaint was the solitary, or even primary, reason for complainant's nonrenewal is unsupported, and ignores the lengthy negotiations devoted to reaching terms of her *continued* employment. The majority has taken note of the inordinately peremptory posture of complainant's attorney in the course of these negotiations. It could reasonably be contemplated that as a logical adjunct to a new employment agreement, complainant would be expected, as a matter of course, to have withdrawn her sex discrimination complaint. What the majority has done is to have placed undue emphasis upon that complaint as the central object of the negotiation. They have elevated that meritless complaint to the level that complainant's failure to withdraw it is viewed as the only reason for her ultimate rejection, notwithstanding her attorney's rigid negotiating posture, and her own enigmatic stance toward what both sides had apparently taken to be a final settlement. The majority has made an unwarranted textual revision of the June 2, 1989 letter that terminated complainant's teaching assignment, to provide that "since [i.e., because]

Ms. Mittleman brought a sex discrimination complaint, and refused to withdraw it, she would not be permitted to teach at Pace." The actual language, far different from the majority's revisionist paraphrase, needs no emendation. Termination was "in consideration of the pending litigation and *the fact that we have been unable to obtain your agreement on the faculty appointment letter"* (emphasis added).

Two further observations are required. First, the majority view that the dismissal of complainant's main complaint as to discriminatory denial of tenure is "irrelevant with respect to the only issue before us" (i.e., retaliation) can hardly be true. The two charges were tried together in one continuous five-day hearing. Pace's exemplary record for non-gender bias bears heavily on the fundamental question before us with respect to Pace's *intent* to retaliate, and heavily rebuts any such intent.

Second, we cannot agree with the conclusion reached by the ALJ that a finding of retaliation will not have a chilling effect on settlement negotiations pertaining to other discrimination claims. To the contrary, if the present Commission order stands, we believe it will have a disastrous impact on the very minority group the statutory scheme is designed to protect, as well as all other young scholars aspiring to promotion in the academic vineyard.

Let us, for a moment, imagine the advice that general counsel to a college or university must now give if consulted on the legal effect of tenure denial to a female or other minority teacher in its employ. That advice, if the majority decision is to provide any guide, must amount to this: "Look, Mr. Provost, if you have an impeccable record of minority promotion and tenure (just like Pace in its lawsuit with Prof. Mittleman), stand your ground, and deny tenure on the merits. But you must, simultaneously with your tenure denial, terminate the applicant at the end of the existing appointment. Any other course will, at a minimum, create a de facto form of tenure if a discrimination complaint challenging the tenure denial is later filed with the Human Rights Commission, because *any change in* that applicant's status, or even the mention of such a change in any settlement negotiation, will expose you to a retaliation charge, and, if successful, a resultant imposition of lifetime tenure or lifetime pay. Of course, you must apply the same policy to all non-minority tenure applicants, as well."

If governmental intervention in the internal affairs of an institution of higher learning leads to such an absurd result— namely, the expanded employment of an academic guillotine on every college campus in the State—it must be concluded that a judicial decision mandating its use is fatally flawed. The majority simply fails to come to grips with this issue and does not appreciate the sagacity of our clear-sighted general counsel, when she rests on the obvious proposition that there can be no "retaliation" for the filing of a complaint with the Commission if termination occurs before any complaint is filed.

If the majority view should ultimately prevail in this case, Pace may find some consolation in the fact that the cost of complainant's lifetime annuity will not permanently damage the University's fiscal position; the institution can absorb the damage by passing it along to the students in the next round of tuition hikes. When that happens, it will impact nondiscriminatorily on a gender-blind and color-blind basis. For that, at least, we (if not the student body) may all be grateful.

Accordingly, we would affirm the order appealed from, annulling the Commission's determination and dismissing the complaint in its entirety.

ROSENBERGER and KUPFERMAN, JJ., concur with CARRO, J.; SULLIVAN, J. P., and WALLACH, J., dissent in an opinion by WALLACH, J.

Order and judgment (one paper), Supreme Court, New York County, entered October 13, 1992, which set aside, in part, the Commission's decision and, denied its cross motion to enforce said decision, modified, on the law, with costs, and the Commission's decision and order reinstated, except for the provision requiring petitioners to submit to the Administrative Law Judge and the Commission's Law Enforcement Bureau "a staff education plan outlining how it intends to curtail retaliatory practices." There was no evidence or finding of other incidents of retaliation, and thus no "retaliatory practices" that require a staff education plan. The Commission's cross motion to enforce that decision and order is granted, as so modified.