People v Plate (2003 NY Slip Op 51503(U))

[*1]

People v Plate

2003 NY Slip Op 51503(U)

Decided on December 1, 2003

Justice Court Of Village Of Horseheads, Chemung County 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 1, 2003

Justice Court Of Village Of Horseheads, Chemung County 
 PEOPLE OF THE STATE OF NEW YORK, Plaintiff
against
JEFFREY L. PLATE, Defendant.
DOCKET 03040050

John R. Trice of Chemung County (Damian Sonsire, Esq.) Of counsel for the People
Barton & Smith Attorney's At Law (Christopher A. Barton, Esq.) Of counsel for the Defendant

Richard C. Moriarty Sr., J.
FACTS
The defendant Jeffrey L. Plate, was charged on 4/5/03 with Assault in the third degree in violation of §120.00 (1) of the Penal Law, in the Village of Horseheads, New York.
During the early morning on the 5th day of April, in the Village of Horseheads the victim and the defendant got into an argument at their apartment in the Village of Horseheads. During the course of the argument the confrontation became physical with the defendant grabbing the victim by the throat, slamming her into kitchen cabinets and throwing her down to the kitchen floor.
Defendant was arraigned at 6:10 PM on 4/5/03, and an Order of Protection was issued, by Judge Driscoll of this Court. When defendant reappeared on 4/14/03 with his attorney, Judge Driscoll recused himself and adjourned the matter to 5/7/03. At the next appearance before Judge Moriarty, a pre-plea was ordered and the matter was adjourned to 7/16/03 for a review of the pre-plea report. On 7/16/03 the pre-plea report was reviewed and the matter was adjourned for Motions to 8/27/03. Motions were made and answered, including a Motion to Dismiss the Information as insufficient, which was denied. Defendant waived a jury trial, and a bench trial was held on 10/02/03. Prior to commencement of the trial, the Defendant executed his waiver in the presence of the Court.
A total of five witnesses testified during the course of the trial. The first witness was the victim, Julie Lynch. She testified that she and the defendant began dating in August, 2002, became engaged on Christmas Eve, 2002 and they moved in together on or about February 1, 2003. She testified that on the morning of 4/5/03, she arose a little after 8:00 in the morning, defendant was up, he had risen before her and had made coffee. They began speaking in a normal conversation, but an argument began when the defendant insisted that she create a budget. The heated discussion shortly turned into a shouting match, which apparently included vulgar language on each side. It culminated with the defendant ordering her out of the house, she refused to leave. She testified that she turned sideways from the defendant, bent over and was putting some pans away when out of the corner of her eye she caught him charging towards her, "grunting." He grabbed her by the neck and her ponytail and slammed her up against the counter [*2]while screaming. According to her testimony, his "eyes were fierce, the look on his face, his eyes were like a wild animal". She also testified that he slammed her head into the cabinets above the counter and he actually had lifted her feet off the floor during this At some point he put her back down onto the floor and was "he was flinging me, like this, around the kitchen" asked to describe it, she made quick jerking motions back and forth with her hands. The victim also testified she was currently 5'3" tall and weighed 104 pounds, which was also her height and weight on 4/5/03. She then claimed to have been slammed against the cabinets again once or twice and then to the floor, she hit her knee on the way down and then ended up on her back. The defendant then held his hands around her neck again holding her down with force enough that she couldn't get away. She was still screaming, until he put his hand over her mouth and nose such that she couldn't breathe. All the while the defendant was telling her to " shut up, shut up." The struggle continued, until the defendant suddenly let her up and moved away from her. She gathered some personal articles, left the apartment and drove to the home of her girlfriend, Sandra Hayes.
Ms. Lynch described her physical condition, as being sore, there was an abrasion on her knee, which she reported as painful, it was very difficult to move, she had a cut along her eye and there was pain around her neck and shoulder.
Certified copies of Ms. Lynch's medical records were admitted as People's Exhibit #1, with no objection from the defense. There were no stitches taken at the hospital, however she was given four tablets of Ultracet which she claimed did not relieve the pain.
The medical records from Arnot-Ogden Medical Center indicated that the victim complained of right knee pain, all over body aches, and pain on the right side of her neck and shoulder. The pain "level" indicated was "3", which is more towards the mild, than the severe side of the scale. Physical examination revealed a 1 ½ " abrasion over right eye, black and blue under right eye, two 1cm abrasions left chin, slight faint bruising over anterior neck, contusions on front of neck, faint redness noted over mid shoulder blades, and small abrasion on right knee. She was given pain medication and discharged.
The victim testified that when she woke up the next day it was very difficult to move, "my head, turn my head side to side was very sore, my arms were very sore, it was difficult to swallow." The swallowing difficulty continued for two full days, but was somewhat better on the third day. She testified that her right knee was swollen for the first two days, she had a terrible headache, that lasted for the day in question and the day after, and she took Motrin every four hours for the rest of the week. She also testified that she couldn't work on Monday, two days after the incident which had occurred on Saturday. She did not report to work for a combination of being sore and being embarrassed because of her appearance. She indicated that her shoulder, arm, and neck pain went away after about a week but her knee still hurt her for about two weeks. The cut over her right eye hurt when she showered and she was left with a visible scar. The scar was pointed out to the Court. A red area was visible, a line from mid-brow down to the corner of her eye.
On cross-examination, it was discovered that the victim had seen her personal physician on 4/8, 4/15 and 4/29/02. While she testified that her physician examined her during these visits, this was not recorded in the office notes which focused on her mental state, rather than her physical state. She was reportedly counseled and given medication for anxiety.
The next witness was, Sandra L. Hayes, her observations are as follows: she observed a [*3]cut about the right eye, dig marks on her jaw, "probably the size of your pinky finger around", three or four marks and this was on the left side of her jaw. The cut was above her right eye, she elaborated on the digs on her jaw. To her it appeared as if there were chunks of skin out of her jaw. They were bleeding but they weren't dripping blood. She also noticed red marks on the victim's neck, the victim pulled down her shirt and she saw red marks, which she described as along her neck and her collar bone area they appeared to her to be finger marks or finger streaks. Later in the day the victim showed her a bruise on her right knee and she was observed to be limping.
Ms. Hayes testified that she observed the victim on nearly a daily basis for the next ten days to two weeks. With regards to her condition, she described her as limping and moving very slowly when she had to stand or sit up, "like she was in pain."
The next witness was the victim's sister, Margaret DeSanto. She testified about the victim's right eye, the gouges on her left jaw and "hand marks on her neck" which appeared to made by fingers. She also saw her sister on a daily basis after the incident and she described her as being very stiff and that her neck was bothering her. She also indicated that her sister had a cut on her knee and that she recalls her limping for about a week and a half after the incident.
Officer Zawko testified as to statements made by the defendant wherein he admitted getting into a fight with the victim which "led to physical contact" and that he pushed her against the cupboards, against the wall and held his hand over her mouth. The People rested after the testimony of Officer Zawko. Attorney Barton made a Motion to Dismiss and after hearing oral arguments, the Court reserved decision on the Motion.
Attorney Barton then called the defendant, Jeffrey L. Plate to the stand. On direct testimony the defendant testified that he grabbed the victim by the shirt, pushed her up against the cupboard and that the victim was swinging and kicking at him and she did grab his face, but he had her far enough away where she couldn't hit him. He did eventually pull himself back and she went to the floor "on all fours, crying and screaming." He then reached down grabbed her shoulder, flipped her over onto her back and put his hand on her mouth to calm her down. When she said she couldn't breathe, he reportedly took his hand off her mouth and stood up.
He also admitted that he was aware that she had a neck bruise and that he caused it. He then testified that he did not intend to cause her an injury, but he grabbed her "because I just got very angry".
During cross-examination it was brought out the defendant was 5'10" tall and weighed approximately 160 pounds, is used to heavy physical labor, farm work and between the work and being a drummer, had strong shoulders, arms, and forearms. He also testified on cross-examination that the reason he put his hands on her was because of the " the ways she was talking to me, the fact that she basically took my pride and rammed it down my throat," he was "totally insulted." While he denied grabbing, lifting, and pushing her, he did admit to grabbing her sweatshirt forcing it around, his hands under her neck and pushing her upwards into the cupboards so that her buttocks hit the top of the counter, "I'm sure her butt skidded up on the counter." He indicated that while he never put his hands around her neck, he did put his hands under her neck, under her chin such that he lifted her up against the counter. He also confirmed that after she came down off the counter he moved to the right and she "she fell to the floor", although he denied that he pushed her. The record reflects that his motions were swinging [*4]motion with his arms as if he swinging or flinging something down. He also testified that with regards to the entire incident, he was angry because his pride was hurt, and that anger didn't subside until she walked out of the apartment.
DISCUSSION
Criminal jury instructions require that the Court deliver the following charge to a jury:
In order to find the defendant guilty of this crime, the People are required to prove, from all the evidence in the case, beyond a reasonable doubt, both of the following two elements:
1. That on or about April 5, 2003 in the County of Chemung, Village of Horseheads, the defendant Jeffrey Plate caused physical injury to Julie Lynch; and
2. That the defendant did so with intent to cause physical injury to Julie Lynch.
Motion for Trial Order of Dismissal
At the close of the People's case, the Defendant moved for a Trial Order of Dismissal. Both parties made oral arguments. The defendant supplemented his motion with an eleven page Memorandum of Law addressing the two key issues; intent and physical injury. The memorandum of law had a 103 page appendix, which consisted of Penal Law §120, Penal Law §70.10, Pattern Jury Instructions for Assault 3rd degree, Penal Law §240.26, McKinney's Practice Commentary - Physical injury definition, Penal Law §10.00 (9), Pattern Jury Instructions on credibility of witnesses, Bill of Particulars with Arnot Medical Records, Horseheads Police Report, and full texts of the following cases: People v. Bartkow; People v. Carney; People v. Cheeks; People v. Cicciari; People v. Contreras; People v. Dorsey; People v. Facey Sr.; People v. Foster; People v. Francis; People v. Goins; People v. Ingram; People v. Jimenez Jr.; In the Matter of John G.; People v. Lewis; People v. Morales; People v. McDowell; People v. Oquendo; in the Matter of Pernell M.; In the Matter of Philip A.; People v. Powell; People v. Reed; In the Matter of Robert C.; The Matter of Scott "QQ"; People v. Tabachnik; People v. Wainwright; People v. Ware.
The People had objected to the admission of the Horseheads Police Department report. That report was later reviewed by the Court and was not admitted into evidence considered by this Court, there was no admissible evidence to add to the trial testimony.
In lieu of a responsive memorandum of law, the People submitted a print-out of McKinney's annotated version of §120.00, with several cases highlighted to bring to the Court's attention. Full text of the highlighted cases were also provided. The cases referred to were: People v. Delph; People v. Guzman; People v. Dazi: People v. Brown; People v. Livoti; People v. Sloan; People v. Williams; In re Veronica R.; People v. Bernier. The Court reserved decision and now addresses that motion.
If the People have not presented a legally sufficient or a prima facie case at the close of their proof, a motion for a trial order of dismissal must be granted. The evidence presented must be viewed in a light most favorable to the People, People v. Sajous, 661 N.Y.S.2d 488 (1997), affirmed, 705 N.Y.S.2d 499, leave to appeal denied 94 N.Y.2d 952. A prima facie case does not require proof beyond a reasonable doubt, but competent evidence that if accepted as true, establishes that the crime was committed and that the Defendant committed it. Whether or not the evidence is convincing enough to prove the Defendant guilty beyond a reasonable doubt is for the factfinder to decide, "the issue of legal sufficiency is separate and apart from evaluation of [*5]whether the evidence is convincing, ... evidence may be 'legally sufficient', but inadequate to prove guilt 'beyond a reasonable doubt." Preiser, McKinney's Practice Commentary, CPL Article 70.
Penal Law §10 (9) defines physical injury. It is defined as "impairment of physical condition or substantial pain." However, since its' inception in 1967, the Courts have wrestled with the definition of "impairment of physical condition" and with the definition of "substantial pain."
The question of substantial pain has both a subjective element and an objective element. The subjective element, is relatively easy to discern, did the victim subjectively feel as though (s)he suffered substantial pain. However "concerned that a serious criminal conviction might rest upon inconsequential injury, the Court of Appeals has been strict in requiring proof of an objective level of physical injury." Donninio, McKinney's Practice Commentary, PL Article 120.
The Court has defined an objective test to assist the factfinder in determining whether or not the use of deadly physical force was justified,

"The critical focus must be placed on the particular defendant and the circumstances actually confronting him at the time of the incident, and what a reasonable person in those circumstances and having defendant's background and experiences would conclude." People v. Wesley, 76 N.Y.2d 555 (1990). 
as well as to determine whether or not the defendant is entitled to affirmative defense of extreme emotional disturbance,

"there must have been a "reasonable explanation or excuse": for such extreme emotional disturbance, "the reasonableness of which is to be determined form the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be." People v. Casassa, 49 N.Y.2d 668 (1980). 
but the Court has not specified such an objective test for substantial pain, except for the statement "there is an objective level, ... , below which the question is one of law, and the charge should be dismissed," In the Matter of Philip A., 49 N.Y.2d 198 (1980). These words have been cited by Court after Court when overturning convictions for third degree assault, or more often convictions of crimes that were aggravated to a higher level because the victim was alleged to have suffered a physical injury..
There is no question that what would appear to some observers to be an injury, without more, has not met the definition of substantial pain, or at least has not risen above that level "below which the question is one of law." In the Matter of Philip A., Supra. 
The defendant correctly cites case law that affirms this proposition, and all have been reviewed by this Court. However, one theme runs throughout these cases. The victim is punched, struck with an object, shot, choked, kicked, shoved or otherwise pummeled by the Defendant and may have even sustained visible cut(s), bruise(s), black eye(s), abrasion(s), swelling, stiffness, soreness, numbness, red marks, sought medical treatment, and/or suffered a headache. However what is lacking is that the record is not fully developed with regards to the "substantial" component of the "substantial pain" requirement. Some of the cases cited by the Defendant illustrate that point.
[*6]
People v. McDowell, 28 N.Y. 2d 373, 375 (1971),(the incidental reference to a blackened eye without any development of its appearance, seriousness, accompanying swelling, or suggestion of pain was insufficient to sustain the felony conviction); Matter of Philip A. 49 N.Y. 2d 198 (1980),(two punches to the face causing red marks, crying, and unspecified degree of pain was insufficient proof of physical injury); People v. Marrero ad 8 ad 2d 998,999-1000 (2d Dep't 1982), (The mere fact that the victim was examined at a hospital was not enough to indicate there was substantial pain); People v. Carney, 179 A.D.2d 818 (2d Dep't 1992), (victim sustained bruises on arm and neck, did not seek medical attention, no testimony about nature or extent of her pain); People v. Cheeks, 161 A.D.2d 657 (2d Dep't 1990), (Victim testified he experienced pain when hit twice over the head with a gun, but no testimony of duration or degree of pain);
People v. Rojas, 61 N.Y.S.2d 726 (1984), (gunshot injury by itself does not establish substantial pain).
The instant case may be distinguished from the above and other cases cited (with the exception of the New York City cases which have persuasive, not controlling effect on this Court), in that here there were medical reports and here there was extensive testimony to establish that in fact this victim did suffer "substantial pain."
The evidence consisted of testimony of the victim, testimony of her sister and testimony of a person who was a mutual friend of both the victim and the Defendant. The pertinent testimony of the victim is that when she woke up the next day it was very difficult to move, "my head, turn my head side to side was very sore, my arms were very sore, it was difficult to swallow." The swallowing difficulty continued for two full days, but was somewhat better on the third day. She testified that her right knee was swollen for the first two days, she had a terrible headache, that lasted for the day in question and the day after, and she took Motrin every four hours for the rest of the week. She also testified that she couldn't work on Monday, two days after the incident which had occurred on Saturday. She did not report to work for a combination of being sore and being embarrassed because of her appearance. She indicated that her shoulder, arm, and neck pain went away after about a week but her knee still hurt her for about two weeks. The cut over her right eye hurt when she showered.
Both her sister and her friend, Sandra L. Hayes, testified as to her appearance shortly after the incident; she was bruised, she had red marks on her neck and collar bone, she had gouge marks on her face, she had a red scratch over he eye, she had an abrasion on her knee. These objective visible physical signs, were verified by the medical examination. They also testified as to their objective observations about her manifestations of pain for the next ten days to two weeks. During this period, the victim appeared to move with difficulty (as if in pain) and she was limping.
This certainly seems to rise above that threshold, "below which the question is one of law" In the Matter of Philip A., Supra. Similar injuries were enough in People v. Guzman, 200 A.D.2d 188 (1st Dep't 1999), (Dark reddish streaks on his face, cuts and bruises that lasted several days and soreness to his lip, face and ribs lasting for several days); see further: People v. Brown, 243 A.D.2d 749 (3d Dep't 1997), (Choked, visible marks on both sides of her neck, neck was sore, had a hard time swallowing, medical personnel confirmed marks on neck); People v. Dazi, 195 A.D.2d 571 (2d Dep't 1993),(Four days after incident had a black eye, abrasions of nose, and tenderness in his jaw and neck muscles); People v. Livoti, 682 N.Y.S.2d 523 (1st Dep't 1998), [*7](bruised, swollen, and aching neck, physician reported redness on both sides of windpipe area, victim had difficulty eating, sleeping and speaking). 
Even if it were decided otherwise, substantial pain is not the only evidence of physical injury. The statute clearly defines physical injury is as "impairment of physical condition or substantial pain." While the nature of the crime of assault may very well cause both impairment of physical condition and substantial pain, the law does not require that both elements be proven and legally sufficient evidence of either suffice for a prima facie case.
There is no requirement that the term "impairment of physical condition" requires a victim's incapacitation. The Court of Appeals specifically rejected that contention in People v. Tejeda, 78 N.Y.2d 936 (1991), (A scar ½" in diameter over complainant's right eye still visible at trial 4 months later, constitutes "impairment of physical condition"). Here the trial record shows that this victim had a visible scar over her right eye, some 6 months after the incident.
Thus the People have met their burden of proving by legally sufficient evidence that the victim suffered a physical injury. Her testimony and Officer Zawko's testimony constitute legally sufficient evidence that the Defendant caused it. The other major issue is whether or not the Defendant intended to cause the physical injury.
Intent in this context requires that the Defendant's conscious objective was to cause the injuries to the victim. "Intent can be inferred from the criminal act itself as well as from the surrounding circumstances, and a jury may infer that a defendant intends the natural and probable consequences of his actions. People v. Steinberg, 170 A.D.2d 50 (1st Dep't 1991), aff'd People v. Steinberg, 79 N.Y.2d 673 (1992). 
The victim testified that the Defendant charged towards her, "grunting." He grabbed her by the neck and her ponytail and slammed her up against the counter while screaming ...his "eyes were fierce, the look on his face, his eyes were like a wild animal". She also testified that he slammed her head into the cabinets above the counter and while doing this he actually lifted her feet off the floor and later whipped her back and forth before throwing her to the floor, first on her hand and knees then on her back where he put his hand over her mouth and nose, such that she could not breathe. In cases where there is no admission by the defendant that he intended to commit and act, intent may be inferred by the totality of the circumstances. "Often there is no direct evidence of a defendant's mental state and the jury must infer the mens rea circumstantially from the surrounding facts." People v. Smith, 79 N.Y.2d 309 (1992). The mens rea here is a fact question and given the testimony presented, a jury could reasonably infer that the Defendant intended to inflict physical injury on the victim.
The People have presented a legally sufficient evidence that the Defendant did intentionally cause physical injury to the victim, Julie Lynch. Motion for Trial Order of Dismissal is denied.
Proof Beyond a Reasonable Doubt
The Defendant did raise some doubt on the credibility of the victim's testimony. It was pointed out that with regards to doctor visits after the incident there were no notations about the victim's leg injuries. However, neither were there any notes on her obvious facial injuries, one of which was still visible at the time of trial. Instead, the doctor seemed to be more concerned about her psychological condition and that was the focus of his notes and his treatment.
Other than the hospital personnel, the most credible witness with regards to objective [*8]signs of the victim's substantial pain, was Sandra L. Hayes. She described herself as a friend of both the victim and the Defendant. She saw the victim immediately after the incident and on a daily basis for the next ten days to two weeks.
The Defendant's testimony was damning. While he did not strike the victim, this powerfully built 160 pound man, testified that he lifted the victim (5'4", 104 pounds) by her neck (it matters not whether he grabbed her around the neck, or pushed his fists into the side of her neck) and pushed, her into the kitchen cabinets. She said he repeatedly banged her into the cabinets, he said she was thrashing about. While at first he denied lifting her off the floor, he did allow that "I'm sure her butt skidded up on the counter." He testified that he was angry and on cross-examination he admitted that he was "totally insulted," and that "she basically took my pride and rammed it right down my throat." His testimony also indicated that he moved to one side and dropped (or threw) the victim to the floor. He then described a violent motion when he flipped her over on her back and put his hand over her mouth when she wouldn't stop screaming.
His testimony basically substantiated the victim's testimony as to the events. The physical actions were taken after a shouting match wherein the victim did not back down from him and refused his order to leave, then she turned away from him. He was extremely angry, he physically overpowered her and slammed her about while venting that anger.
There can be little doubt that the Defendant intended to physically punish the victim for challenging him. The evidence indicates that the victim suffered both substantial pain and impairment of physical condition. The Court finds the Defendant guilty beyond a reasonable doubt, in that on or about April 5, 2003 in the County of Chemung, Village of Horseheads, the Defendant Jeffrey A. Plate intentionally caused physical injury to Julie Lynch, in violation of §120.00(1) of the New York State Penal Law.
Let judgement enter accordingly.
Enter:Horseheads, New York
Date :December 1, 2003
________________________________________
Richard C. Moriarty Sr. Village Justice
cc: Hon. John R. Trice, D.A.
Christopher A. Barton, Esq.
Decision Date: December 01, 2003