Ahmed MOHAMED, Plaintiff,

v.

**MARRIOTT INTERNATIONAL, INC. and Marriott Corp., Defendants.**

No. 94 Civ. 2336 (RWS).

United States District Court, S.D. New York.

Oct. 24, 1995.

Rich & Simmons, L.L.P., New York City (Alan J. Rich, Linda Simmons, of counsel), for Plaintiff.

Laurie Berke–Weiss, New York City, Carlton J. Trosclair, Julienne W. Bramesco, Marriott International, Inc., Bethesda, MD, Marc Abrams, Portland, OR, for Defendants.

## OPINION

SWEET, District Judge.

In this action, originally brought under the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* (Supp. V 1993), ("ADA"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (1988 & Supp. V 1993) ("Title VII"), and the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq.* (McKinney 1993) by Plaintiff Ahmed Mohamed ("Mohamed") against Defendants Marriott International, Inc., and Marriott Corporation (collectively referred to here as "Marriott"), Marriott has moved for summary judgment under Federal Rule of Civil Procedure 56 and seeks Rule 11 sanctions against Mohamed and his attorney, Alan Rich ("Rich").

Mohamed has cross-moved to amend his complaint, to reopen discovery, and to recover attorney's fees. Mohamed also seeks Rule 11 sanctions against Marriott's attorney Laurie Berke–Weiss ("Berke–Weiss").

For the reasons discussed herein, Mohamed's motion to amend the complaint will be granted; Marriott's motion for summary judgment will be extended to all of the claims under Mohamed's amended complaint and will be granted in part and denied in part; Mohamed's motion for costs will be denied; and both Marriott's and Mohamed's motions for sanctions will be denied.

### Prior Proceedings

Mohamed filed his Complaint on April 1, 1994, against Marriott International, Inc., Marriott Corporation, and Times Square Hotel Company (collectively referred to here as the "Original Defendants"). The Original Defendants answered on August 11, 1994, and amended that Answer on September 28, 1994. By stipulation of the parties, this Court ordered on December 19, 1994, that the action was to be discontinued with prejudice against Times Square Hotel Company only.

This motion for summary judgment was filed by Defendants on May 23, 1995. Discovery took place through June 30, 1995. Mohamed filed papers opposing the motion for summary judgment and moving for leave to amend the complaint, to reopen discovery proceedings solely for the purpose of taking the deposition of Teresa Heffernan ("Heffernan"), and for attorneys' fees. Marriott replied to Mohamed's cross-motions and further supported its motion for summary judgment on July 20, 1995, and moved for Rule 11 sanctions against Mohamed and Rich.

After further submission, oral argument was heard on August 2, 1995, and Mohamed's motion to reopen discovery proceedings with regard to Heffernan was granted. Decision on the remaining motions was reserved. Supplemental affirmations were submitted on August 18, 1995, and the motions were considered fully submitted on August 21.

### The Parties

Mohamed was born in Egypt, came to the United States in 1985, and is now a resident of New York City. He is a profoundly deaf man who lacks the power of intelligible speech. Mohamed's primary mode of communication is American Sign Language (ASL). He can read English at a level sufficient to comprehend magazines and want advertisements in newspapers. He can write using English vocabulary and ASL grammar and syntax in a manner somewhat intelligible to English readers, particularly those accustomed to reading Mohamed's written English.

Defendant Marriott International, Inc., is a Delaware corporation licensed to do business in the State of New York. Defendant Marriott Corporation was a Delaware corporation licensed to do business in New York through October 7, 1994. Marriott International operates the Marriott Marquis (the "Hotel"), a hotel at 1535 Broadway in New York City formerly managed by Marriott Corporation.

*Facts*

In deciding a motion for summary judgment, "[a]s a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 320 n. 2, 106 S.Ct. 2548, 2551 n. 2, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting), *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)); *see United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Cartier v. Lussier*, 955 F.2d 841, 845 (2d Cir.1992); *Burtnieks v. City of New York*, 716 F.2d 982, 983–84 (2d Cir.1983). The facts as presented here are construed accordingly, and they are limited to this motion.

On April 6, 1988, Mohamed began work at the Hotel as a result of an affirmative hiring program instituted by Marriott. At first he served as a steward and in the housekeeping department. In 1989, Mohamed was voluntarily transferred to the engineering department, where his jobs included wallpapering, sanding, vinyl application, and similar tasks.

The Hotel employs approximately fifty deaf employees and receives substantial tax advantages for doing so. Marriott employed, for some time, Anna Burns ("Burns"), a qualified interpreter whose function was to intervene in situations requiring communication between Marriott's hearing-impaired employees and others at the Hotel. Since the time of Mohamed's discharge, seven Marriott employees have undertaken the study of ASL at Marriott's behest.

Because communication among members of the engineering department was carried on largely through paging devices ("beepers") and radios, a condition of Mohamed's transfer was that he be assigned to work with a partner, who would facilitate his communication. Mohamed did not directly make use of paging devices or radios, relying instead on his partner, Pedro Coelho ("Coelho") to communicate with their manager Al Woodies ("Woodies") and with others. Woodies and Mohamed, after some time working together, established the ability to communicate to some extent via Woodies' improvised sign language.

Mohamed generally received his work assignments each morning, when Woodies' crews would meet with him to discuss the day's work. During the course of the day, it was Woodies' practice to make rounds of the various locations at which members of his crew were at work.

Prior to October 1, 1993, Mohamed was held in exceptionally high esteem by his supervisors at the Hotel, including the Director of Engineering, Edmund Pietzak ("Pietzak"). Mohamed had received raises every year, as well as two employee merit awards that included prizes, cash awards, and letters of commendation.

On October 1, 1993, Mohamed was, atypically, assigned to work alone. His assignment was to sand tables and to paint the door of a cloakroom on the sixth floor of the Hotel. At approximately 8:00 A.M., Woodies escorted Mohamed to the room to show him his assignment. Between 9:30 A.M. and 10:30 A.M., Mohamed returned to the room and began work on the project.

By approximately 11:45 A.M., Mohamed had completed painting. He left the room and extinguished the light. At some time during Mohamed's absence Norma Santos ("Santos"), a Marriott employee who worked in the cloakroom, entered the room and left her bag in the room with the door unlocked and the lights on. On returning to the room a short time later, according to Mohamed's assertions, he noticed the bag, out of which had spilled a small, clear, plastic bag, which contained four hundred eighty dollars in cash. Mohamed removed the plastic bag with the money from the floor.

Mohamed asserts that he next went directly from the coat room to the second floor of the Hotel, where the engineering workshop and Woodies' office were located. There Mohamed asked George, a member of Mohamed's engineering team, where Woodies was. George either did not know, did not understand Mohamed, or chose not to respond. Mohamed then proceeded down two stories to the Hotel's "A" level and placed the money, still in its bag, in his locker. The security office, human resources office, and engineering department manager's office are all on the A level.

Mohamed then revisited the second floor shop, but, still not finding Woodies, returned to the cloakroom. It was Woodies' habit to make rounds of the Hotel to check on his workers throughout the day. Mohamed asserts that he expected that, since it was near lunchtime, he would see Woodies presently either at lunch or on Woodies' rounds. At no time did Mohamed attempt to page Woodies using Woodies' paging device. Mohamed did not know how to do so himself, would have been unable to hear the necessary cues, and was separated from Coelho, who would normally have paged Woodies on Mohamed's behalf. Mohamed asserts that during this time, he was attempting to find Woodies. Marriott asserts that Mohamed had no such intent.

On leaving the cloakroom again, Mohamed crossed paths with Norma Santos, who was entering that room. Santos, on examining her bag, discovered that her money was missing and reported the loss. With the assistance of the security and human resources department, Santos identified Mohamed as the worker she had seen in the cloakroom.

Soon thereafter, Woodies approached Mohamed but was paged immediately and walked away to the telephone without communicating with Mohamed. Woodies was then taken aside by Mike Dominguez ("Dominguez"), Marriott's Director of Loss Prevention, and Cherron Collins, a manager from the human resources department. They then approached Mohamed, whose first reaction was to sign to Collins, who understood some ASL, that he had found some money and to ask if something was wrong. Collins signed to Mohamed that she did not want to communicate with him until they had reached the security office.

Once Mohamed, Collins, Woodies, and Dominguez had reached the security office, they were joined by Valerie Contreras, Manager of Human Resources ("Contreras"). (This October 1, 1995, meeting is referred to here as the "First Meeting".) At the First Meeting, Collins undertook both to interview Mohamed regarding the circumstances surrounding the missing money and also to interpret from ASL into English for the others present.

Collins, who had earlier taken two night classes in ASL, with a cumulative twelve to sixteen hours of classes, was not highly proficient in ASL. She had had difficulty communicating with Mohamed on prior occasions. During the First Meeting, Collins had substantial difficulty interpreting, giving rise to confusion. Mohamed was forced to repeat himself several times. According to Mohamed, he set forth the facts as described above consistently and truthfully, noting his efforts to find Woodies to report the missing money. Collins, because of the substantial miscommunication, indicated to Woodies, Dominguez, and Contreras that Mohamed was telling several inconsistent stories. In one instance during the First Meeting, Collins indicated that Mohamed was telling three conflicting stories as to where he had found the money: first denying that he had the money, then admitting finding the money underneath the bag, and finally stating that, thinking the bag was garbage, he had picked it up and the money had fallen out. In another example of the resulting confusion, Collins, misinterpreting an ASL sign as "credit card", stated that Mohamed had admitted that he had stolen the money in order to settle his credit card bills. In fact, Mohamed, who had no credit card debt, said no such thing.

After approximately an hour and a half, Contreras called a halt to the meeting, instructing Mohamed to go home and stating that she would call for an interpreter for a second meeting. Mohamed alleges that by the end of that First Meeting, as a result of

Collins' misinterpretations, the parties present at the First Meeting became convinced that Mohamed was lying and that he had indeed stolen the money without intent to return it. In the meantime, Mohamed asserts, he, unable to hear exchanges among the others present, was unaware of the source of the confusion.

The signatures of three people were necessary to approve the termination of Mohamed's employment: Pietzak, Contreras, and Jurgen Giesbert ("Giesbert"), the General Manager of the Hotel. Of the three, only Contreras was present at the First Meeting.

Prior to approving the termination, at some time between October 1 and October 4, 1993, Pietzak spoke with Woodies and Dominguez, both of whom had been present at the First Meeting. Woodies and Dominguez both told Pietzak that Mohamed had stolen money, and both recommended termination. In addition, Pietzak spoke with Mark Sanders, the head of the human resources department, who had conducted similar conversations with Woodies and Dominguez. Pietzak presumed that the information with which he had been provided was accurate and conducted no further review of the matter.

Giesbert, as general manager of the Hotel, was in the habit of approving recommendations to terminate employment without investigating further. His approval was, in effect, *pro forma.* In making a decision regarding Mohamed's termination, Giesbert relied on the recommendation of Pietzak and information provided by Contreras. Giesbert was unaware of the details of Mohamed's deafness, Mohamed's work habits, or the circumstances regarding the interpretation at the First Meeting.

In formulating her decision to fire Mohamed, Contreras relied on the interpretation at the First Meeting, including additional information supplied to her by Collins and Dominguez. She was under the false impression that Mohamed was capable of speaking with others and as to the circumstances of his work routine.

On Monday, October 4, 1993, a meeting was held at the Hotel (the "Second Meeting"). Present were Mohamed, Contreras,

Chuck Duffner, Woodies' supervisor from the engineering department, and Heffernan, a professional interpreter. At the Second Meeting, after another discussion of the events of October 1, Mohamed was given another opportunity to vindicate himself. After listening to his explanation, which Mohamed contends was the same, consistent one described above, Contreras informed Mohamed that his employment was terminated. At the Second Meeting Contreras accused Mohamed of lying at the First Meeting. As grounds for the termination, Contreras told Mohamed that he was being fired because he was supposed to give the money he had found to a guard and to contact the personnel office or the human resources department, rather than placing the money in his locker. Mohamed had initialled a statement at the time of his employ stating, "I will not place valuable belongings in the locker, as I understand that my employer cannot accept responsibility for loss of such items."

On October 4, Giesbert, Pietzak, and Contreras signed a form terminating Mohamed's employment. Heffernan signed the form as well to indicate her presence at the Second Meeting. At that point, Mohamed's termination became effective.

### The Motion to Amend the Complaint is Granted

■ Mohamed seeks to amend his complaint to include a claim under the New York City Civil Rights Law, a claim for intentional and reckless infliction of emotional distress, and a request for attorney's fees. In addition, he seeks to add Xiomara Amaya Mohamed, his wife, as a plaintiff in this action, claiming that she possesses a claim for loss of consortium. Finally, Mohamed's proposed amended complaint also abandons his original separate claims for alleged pain and suffering and for punitive damages.

■ Federal Rule of Civil Procedure 15(a) provides that leave to amend a complaint "shall be freely given when justice so requires." The decision to grant or deny the filing of an amended pleading, however, is within the sound discretion of a trial judge. *Zenith Radio Corporation v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *Katz v. Morgenthau,* 892

F.2d 20, 22 (2d Cir.1989). The Supreme Court has interpreted Rule 15 to permit such amendments only when (1) the party seeking the amendment has not unduly delayed, (2) that party is not acting in bad faith or with a dilatory motive, (3) the opposing party will not be unduly prejudiced by the amendment, and (4) the amendment is not futile. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Evans v. Syracuse City School Dist.,* 704 F.2d 44, 46 (2d Cir. 1983); *see also Ansam Assocs., Inc. v. Cola Petroleum, Ltd.,* 760 F.2d 442, 446 (2d Cir. 1985) (trial court required to take into account any prejudice that might result to party opposing the amendment) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330–31, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971)).

Marriott asserts that it will be prejudiced by the amendment, compelling additional time and wasteful discovery. It argues that two of the claims Mohamed seeks to add— intentional infliction of emotional distress and loss of consortium—will require potentially extensive additional discovery of issues not faced by the parties during the fifteen prior months of litigation. It is true that where a party, "in seeking to add myriad new claims, advances no reason for his extended and undue delay, other than ignorance of the law; such a failure has been held an insufficient basis for leave to amend." *Goss v. Revlon, Inc.,* 548 F.2d 405, 407 (2d Cir.1976) (citations omitted). Marriott contends that the motion to amend comes before the Court in a posture of extreme delay, and that the new claims are asserted merely to convince this Court of a need for further delay and discovery.

The proposed complaint, however, represents Mohamed's first attempt to amend his Complaint. Although he waited for over a year before making this motion, Marriott did not make any motion to dismiss or for summary judgment in the meantime. Mohamed therefore has not unduly delayed or prejudiced Marriott by bringing this motion. *See Oliver Schools, Inc. v. Foley,* 930 F.2d 248, 253 (2d Cir.1991).

■ Marriott contends that the proposed complaint would be futile in light of the prior

proceedings. An amendment is considered futile if the proposed pleading fails to state a claim or would be subject to a motion to dismiss on some other basis. *See, e.g., S.S. Silberblatt, Inc. v. East Harlem Pilot Block,* 608 F.2d 28, 42 (2d Cir.1979); *Freeman v. Marine Midland Bank–New York,* 494 F.2d 1334, 1338 (2d Cir.1974). The new claims interposed by Mohamed state an appropriate cause of action.

Mohamed's amendments come, moreover, at the end of discovery, when it can be well expected to interpose new claims. In *Zenith,* for instance, the movant sought to amend its reply a year after discovery had been closed, and after the trial judge had entered preliminary findings of facts and conclusions of law favoring the non-movant. *Zenith,* 401 U.S. at 323–25, 91 S.Ct. at 798–99. Given this timing, and in the absence of evidence of bad faith, the motion to amend the complaint will be granted.

Marriott has requested that its motion for summary judgment be extended immediately to the new causes of action in the event that the requested amendment is permitted. All of Marriott's claims are, therefore, addressed herein.

### Standard for Summary Judgment

■ The instant motion is brought pursuant to Rule 56. The Rule 56 motion for summary judgment is "an integral part" of the Federal Rules of Civil Procedure and facilitates the overall purpose of the Rules as stated in Fed.R.Civ.P. 1: namely, "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). A motion for summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Silver v. City Univ.,* 947 F.2d 1021, 1022 (2d Cir.1991). If, when "[v]iewing the evidence produced in the light most favorable to the nonmovant ... a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is ap-

propriate." *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991).

### The Motion to Dismiss the Claim Under the Americans With Disabilities Act is Denied

The Americans with Disabilities Act states that:

No covered entity shall discriminate against a qualified individual with a disability because of the disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

Mohamed asserts that Marriott discriminated, in violation of this statute, in two ways. First, he alleges that Marriott failed to accommodate his deafness in the process leading up to the termination of his employment. Second, he asserts that he was subjected to disparate treatment.

As a threshold matter, Marriott is a "covered entity" under the meaning of the statute. An "employer" is a covered entity under the ADA. 42 U.S.C. § 12111(2). The definition of "employer" includes:

a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person.

42 U.S.C. § 1211(5)(A). Marriott is thus a covered entity under the plain language of the statute.

Application of the ADA next requires a determination as to whether Mohamed is a "qualified individual with a disability." Under the statute, a "qualified individual with a disability" includes "an individual with a disability who, with or without reasonable accommodation, can perform the essential function of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The parties have conceded that deafness constitutes a disability. All that remains, then, is to determine if Mohamed was qualified, as defined by the ADA.

For four years Mohamed received consistently positive evaluations and commendations, with no record of disciplinary action. Absent the events of October 1, 1993, Mohamed was a qualified individual, capable of performing the essential functions of his position.

Marriott concedes the caliber of Mohamed's performance and that prior to the incident in question, Mohamed was qualified. However, Marriott counters that Mohamed's actions on October 1, 1993, rendered him unqualified by virtue of the theft. Whether or not Mohamed actually intended to return the money, according to Marriott, he violated company policy by reacting improperly to his discovery of the money in failing to turn over the money to a responsible party. Marriott contends that on the way from the cloakroom to his locker, Mohamed had ample opportunity to ask someone in writing for help in contacting Woodies, to walk into the human resources or security office and turn over the money, or to take other measures short of placing the money in his locker. Second, Marriott asserts, the company policy prohibiting employees from storing valuables in their own locker, though worded in terms indicating the policy was meant to protect employees' own belongings, implied a company policy against placing *anything* of value in a locker. Either of these failings, Marriott contends, was sufficient to terminate Mohamed's employment, regardless of his ability or disability, and so he proved himself unqualified.

Mohamed's response renders this issue one of material fact. The facts, interpreted in favor of Mohamed where there are ambiguities, do not present a clear picture of theft. Mohamed has built a tenable case that he found the money outside the bag, searched with due diligence for Woodies, and placed the money in his locker for safekeeping, prudently judging it the safest place to do so, in the full expectation that he would soon encounter Woodies. If so, Mohamed's actions did not render him unqualified.

Mohamed's failure to take greater measures to contact Woodies, such as asking another employee in writing to page Wood-

ies, could be found by a finder of fact not to render Mohamed unqualified. Mohamed's history of difficulty communicating with other employees, his special relationship with Woodies, the absence of Coelho (his normal conduit to Woodies and to others), his inquiries of George as to Woodies' whereabouts, and his reasonable expectation that he would soon encounter Woodies could all lead a finder of fact to deem Mohamed's actions those of a qualified employee. The Marriott employee handbook reads, "If you have a problem or complaint, this is what you should do: Step 1—TELL YOUR IMMEDIATE SUPERVISOR." Marriott has no written policy concerning lost and found items, but it was an unwritten policy that lost items were to be brought to an employee's manager. If Marriott did have unwritten, informal policies that such items were to be turned into the security, housekeeping, or human resources departments, on this record it has not been established that those policies were communicated to Mohamed.

Contrary to Marriott's contention, Mohamed's placing the money in his locker did not necessarily render him unqualified. Marriott's policy, as stated in its handbook, stated, "Please do not bring large amounts of cash, jewelry or valuables to work with you. The hotel is not responsible for valuables left in lockers." Although Mohamed might reasonably have drawn an inference that it was unwise to place found money in his locker, and that failure to draw this inference may have been imprudent, a finder of fact could find that these steps did not rise to a level that rendered Mohamed unqualified.

Finally, Marriott has not demonstrated that these offenses, even if they violated Marriott policy, automatically render an individual unqualified. Marriott divides its offenses into those for which one can be terminated and those for which a progressive disciplinary procedure is used. Of the infractions, Marriott admits, only theft constituted grounds for termination at the time of the incident in question. In addition, similar and greater infractions by other Marriott employees, including sexual harassment and theft of Hotel property, were often dealt with though a reprimand, a restatement of policy to the offending employee, a remark placed in that employee's record, and a continuation of employment. Given Marriott's willingness to retain in its employ those who had committed such offenses, a finder of fact could easily infer that those employees, and, by extension, Mohamed, were qualified.

In sum, Marriott has failed to establish, to the extent that it no longer constitutes a genuine issue of material fact, that Mohamed's actions rendered him unqualified by virtue of being incapable of performing the essential functions of his position.

***The Motion to Dismiss the Claim of Discrimination on the Basis of Failure to Accommodate is Denied***

The statutory language on which Mohamed bases his claim for failure to accommodate reads:

... the term "discriminate" includes ...

(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

42 U.S.C. § 12112(b).

The crux of Mohamed's claim under this paragraph is that Marriott failed to provide a qualified interpreter at the First Meeting, relying instead on Collins, who was unqualified. That failure, contends Mohamed, led the parties present to garner the false impression that Mohamed was repeatedly changing his story, that he was lying, and that he had stolen the money without intent to return it. Invoking a type of "fruit of the poisonous tree" argument, Mohamed contends that those misapprehensions resulted in a chain of misinformation that caused those responsible for the termination to make the termination decision, despite his attempts to set the record straight. Had a qualified interpreter been present at the First Meeting, Mohamed argues, he would easily have allayed the concerns of those present, and his employment would not have been terminated. Provision of an inter-

preter, he contends, was a reasonable accommodation that would not have caused undue hardship to Marriott.

▮ Our Court of Appeals has not addressed the meaning of "reasonable accommodation" or "undue hardship" in the context of the ADA. However, as this Court has noted:

> The ADA was modeled in part after the Federal Rehabilitation Act of 1973, as amended 29 U.S.C. §§ 791 and 794(a), which forbids discrimination against individuals employed by the federal government, government contractors and recipients of federal assistance. *See* 1990 U.S.C.C.A.N., Legislative History P.L. 101–336 [Americans With Disabilities Act] at 337–366. Thus, cases brought under the Rehabilitation Act are instructive with respect to the ADA.

*Abbasi v. Herzfeld & Rubin, P.C.,* 863 F.Supp. 144, 145 n. 1 (S.D.N.Y.1994). *See also Vande Zande v. State of Wis. Dept. of Admin.,* 44 F.3d 538, 542 (7th Cir.1995) ("the employment provisions of the [Americans with Disabilities] Act merely generalize to the economy as a whole the duties, including that of reasonable accommodation, that the regulations under the Rehabilitation Act imposed on federal agencies and federal contractors.") Indeed, the ADA's definitions of reasonable accommodation and undue hardship are "borrowed from" the regulations promulgated by the Equal Employment Opportunity Commission under the Rehabilitation Act. *Vande Zande,* 44 F.3d at 542; *see* 34 C.F.R. §§ 104.12(b), (c); 45 C.F.R. §§ 84.12(b), (c). Given these similarities, the paucity of case law in this Circuit on the ADA, and the etiology of the ADA, the Court of Appeals' construction of these terms in the context of the Rehabilitation Act provides substantial guidance.

Thus, the Court of Appeals' very recent decision in *Borkowski v. Valley Cent. School Dist.,* 63 F.3d 131 (2d Cir.1995) helps substantially in guiding the analysis of the reasonable accommodation claim under the ADA. In *Borkowski,* the Court reviewed a grant of summary judgment in favor of the defendant in a Rehabilitation Act claim of employment discrimination based on disability. The Court clearly set forth a framework within which reasonable accommodation claims could be analyzed. Employing this analysis, it becomes apparent that Mohamed has presented evidence sufficient to create genuine issues of material fact with regard to both the reasonable accommodation and the undue hardship questions, and thus to preclude summary judgment on his claim for failure to accommodate.

On the issue of reasonable accommodation, *Borkowski* places on the plaintiff the burden of persuasion that a potential accommodation exists. *Id.* at 137–38. Mohamed has set forth sufficient evidence to persuade a finder of fact that such accommodations existed. These included employment of a full-time interpreter or retention on a temporary basis of interpreters in instances such as the First Meeting, despite the delay the latter would engender.

▮ Having established that accommodation was possible is one question.

> Whether a proposed accommodation is reasonable, however, is another question. "Reasonable" is a relational term: it evaluates the desirability of a particular accommodation according to the consequences that the accommodation will produce. This requires an inquiry not only into the benefits of the accommodation but into its costs as well. . . . In short, an accommodation is reasonable only if its costs are not clearly disproportionate to the benefits that it will produce.

*Id.* at 138 (citations omitted). As to the reasonableness of the accommodation, "the plaintiff bears only a burden of production," *Id.* at 138 (citing *Gilbert v. Frank,* 949 F.2d 637, 642 (2d Cir.1991)), and that burden:

> is not a heavy one. . . . It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits. Once the plaintiff had done this, she has made out a prima facie case showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant.

*Id.* Mohamed has met his burden of production with regard to the reasonableness of

Marriott's having a qualified interpreter on hand for the First Meeting. He has pointed to the fact that Marriott has employed an interpreter, that other deaf employees have been hired, and that Marriott employees are being trained in ASL. Mohamed has, for the purposes of summary judgment, met the minimal burden of production required by *Borkowski*.

That the provision of a qualified interpreter is a reasonable accommodation is buttressed heavily by the language of the statute itself, which reads " 'Reasonable accommodation' may include ... the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9).

The burden of persuasion thus now falls on Marriott under *Borkowski*. Marriott contends that the presence of Heffernan, a qualified interpreter, at the Second Meeting, constituted reasonable accommodation by remedying any misimpressions garnered at the First Meeting. However, a finder of fact could conclude that the misunderstandings that emerged in the First Meeting, due, according to Mohamed, solely to Collins' misinterpretations, set a tone of mistrust of Mohamed that inalterably led to his discharge.

Continuing the *Borkowski* analysis:

At this point the defendant's burden of persuading the factfinder that the plaintiff's proposed accommodation is unreasonable merges, in effect, with its burden of showing, as an affirmative defense, that the proposed accommodation would cause it to suffer an undue hardship. For in practice meeting the burden of nonpersuasion on the reasonableness of the accommodation and demonstrating that the accommodation imposes an undue hardship amount to the same thing.

*Id.*, 63 F.3d at 138 (citing *School Bd. v. Arline*, 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987)). The statute defines undue hardship as follows:

(A) *In general:* The term "undue hardship" means an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B).

(B) *Factors to be considered:* In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include—

(i) the nature and cost of the accommodation needed under this chapter;

(ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

Considering these four factors, a finder of fact could certainly find that hiring an interpreter or retaining one for the limited purpose of the First Meeting would not have constituted a significant difficulty or expense.

Finally, the Court of Appeals' definition of undue hardship in *Borkowski*, states that:

while the plaintiff could meet her burden of production by identifying an accommodation that facially achieves a rough proportionality between costs and benefits, an employer seeking to meet its burden of persuasion on reasonable accommodation and undue hardship must undertake a more refined analysis. And it must analyze the hardship sought to be imposed through the lens of the factors listed...."

*Id.*, 63 F.3d at 139.

A finder of fact could, given the facts presented so far by both parties, find that the benefits of having a qualified interpreter on the spot outweighed its costs to Marriott.

Marriott argues that "failure to accommodate" does not apply to termination decisions, in that such accommodation is necessary only where it facilitate's job performance, not job termination. Marriott cites the EEOC Technical Assistance Manual § 3.3, noting that it does not mention employment termination anywhere. Strictly speaking, however, the need for accommodation arose not in the context of termination *per se*, but in the course of a meeting with an employee to review the disappearance of something of value. The fact that that meeting eventually led to termination makes it no less an element of Mohamed's job performance than a staff meeting, a performance evaluation, or a salary review. The fact that the meeting *resulted in* termination fails to alter this analysis.

For all of these reasons, a genuine issue of material fact exists as to Marriott's failure to accommodate Mohamed. The motion for summary judgment is thus denied as to the claims arising under the ADA from Marriott's failure to accommodate.

### The Motion to Dismiss the Claim of Discrimination on the Basis of Disparate Treatment is Granted

Mohamed asserts that even if Marriott did not fail to accommodate Mohamed, it nonetheless discriminated in violation of the ADA through its disparate treatment of Mohamed because of his deafness. The ADA does not explicitly set out a claim for disparate treatment, which is generally associated with Title VII. As noted above, the ADA is based in large part on the Rehabilitation Act. The new legislation is also, however, based closely on Title VII. The employment title of the ADA adopts the "powers, procedure, and remedies" of parts of Title VII. 42 U.S.C. § 12117. Much of the wording of the two statutes is the same. Courts in interpreting this provision have been quick to apply precedent set under Title VII. *See, e.g., Braverman v. Penobscot Shoe Co.,* 859 F.Supp. 596 (D.Me.1994); *Schartle v. Motorola, Inc.,* 1994 WL 188469, 1994 U.S. Dist. LEXIS 6241 (N.D.Ill. May 11, 1994); *United States v. Illinois,* No. 93 C 7741, 1994 WL 562180 (N.D.Ill. Sept. 12, 1994); *Janopoulos v. Harvey L. Walner & Assocs., Ltd.,* 835

F.Supp. 459 (N.D.Ill.1993). For the purposes of analyzing the disparate treatment claim, the case law under Title VII is relevant.

Under the standard set forth for Title VII cases in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), a plaintiff must present a *prima facie* case of discrimination. *McDonnell Douglas,* 411 U.S. at 803–06, 93 S.Ct. at 1824–26. *See Loeb v. Textron, Inc.,* 600 F.2d 1003, 1014–15 (1st Cir.1979), *Richardson v. Sunmark Indus.,* 560 F.Supp. 733 (E.D.N.Y.1983). A *prima facie* case is established when the plaintiff demonstrates that (1) he is a qualified individual with a disability, (2) he has suffered an adverse employment action, and (3) a causal connection exists between the adverse employment action and the disability. *Tyndall v. National Educ. Ctrs., Inc.,* 31 F.3d 209, 212 (4th Cir.1994); *Smith v. Upson County,* 859 F.Supp. 1504, 1514 (M.D.Ga.1994).

Once the plaintiff has presented his basic case, the defendant may then rebut the case by showing that the reasons for the defendant's actions were for legitimate and non-discriminatory purposes. *McDonnell Douglas,* 411 U.S. at 802–03, 93 S.Ct. at 1824–25. Finally, the plaintiff may attempt to demonstrate that the reasons presented by the defendant are mere pretexts and that discriminatory intent was more likely the cause of the employer's actions. *Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207.

Turning first to the elements of the *prima facie* case, a finder of fact could determine that Mohamed has satisfied them. As established above, a genuine issue of material fact exists as to whether or not Mohamed was a qualified individual under the meaning of the ADA. Further, Mohamed's discharge obviously constituted an adverse employment action. The only remaining element of the *prima facie* case, then, is the causal connection between the disability and the discharge. As noted above, a finder of fact could find that the events of the First Meeting led to Mohamed's discharge. Taking the facts as

alleged by Mohamed, the misunderstandings and miscommunications of that meeting arose solely because of his deafness and Collins' misinterpretation. Had a hearing employee been subject to the same meeting after the same events, Mohamed asserts in effect, that employee would have rapidly and effectively vindicated himself by directly communicating the true story of his efforts to find his supervisor after finding the money in the cloakroom.

 Mohamed having made out his *prima facie* case, the burden now shifts to Marriott to show that its actions were undertaken for legitimate and non-discriminatory purposes. Mohamed asserts that regardless of whether or not Mohamed actually intended to steal the money in question, he violated company policy by placing the money in his locker and thus provided Marriott with a legitimate, non-discriminatory purpose for his discharge. Marriott's employee handbook, which was read with assistance by Mohamed at the beginning of his tenure at Marriott, states, "I understand that I have the right to terminate my employment at any time and that my employer retains a similar right and that my employer's personnel policies and/or handbooks do not constitute an employment contract." Marriott properly points out that given the at-will nature of Mohamed's employment, the threshold for legitimate discharge is low. Absent discrimination, "the employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or no reason at all, so long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir.1984). Under New York law, Mohamed is an at-will employee, with no other such rights in this regard. *Wright v. Cayan*, 817 F.2d 999, 1003 (2d Cir.), *cert. denied*, 484 U.S. 853, 108 S.Ct. 157, 98 L.Ed.2d 112 (1987); *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987). If Marriott can demonstrate that it would, in similar circumstances, have fired a hearing employee, then its purpose is non-discriminatory. Thus, for the purposes of this prong of the *McDonnell Douglas* test (but here only), Marriott need not even have been correct in its belief that Mohamed was

at fault. As one court has put it with reference to the Age Discrimination in Employment Act: "No matter how medieval a firm's practices, no matter how high handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir.1991). For the purposes of this motion, then, Marriott could convince a finder of fact that it possessed a legitimate, non-discriminatory purpose for firing Mohamed.

 Marriott having set out a non-discriminatory reason for its job action, the burden returns to Mohamed to establish that the purported reason is a mere pretext and that Marriott's actions were actually motivated by discrimination. Although Mohamed's discharge may have, as his *prima facie* case makes out (and as supports his reasonable accommodation argument), *resulted from* his deafness, Marriott's decision to discharge him was not *motivated by* his deafness. It is true that a hearing person would not have found himself in the same predicament as Mohamed. It is not true, however, that Marriott's decision to fire Mohamed was based *on his deafness*. In other words, Marriott's firing Mohamed based on his actions on October 1 were *not* a pretext for discharging him because he was deaf.

No evidence of pretext has emerged from this record. Giesbert approved the termination in reliance on information received from Contreras and Pietzak, and he thus did not act with discriminatory animus based on Mohamed's disability.

Contreras, as noted above, was briefed by Collins, believed that Mohamed was changing his story, and believed that the information that Collins interpreted was correct and relied upon it. She relied as well on information provided by Dominguez. There is no basis for concluding that Dominguez harbored animus towards deaf or other disabled persons, and no basis for believing that his investigation was in any way tainted.

Finally, Pietzak, who relied on information from Dominguez and Woodies, presuming

that the information was accurate, similarly formed a belief that Mohamed was untruthful and thus based his decision to discharge on legitimate, nondiscriminatory reasons. No pretext can be found.

With regard to all three parties, then, Mohamed's assertions about the managers' assessments of his actions do not amount to discriminatory intent and do not "create a causal connection between the adverse employment action and disability." *Tyndall*, 31 F.3d at 212.

In arguing that Marriott's actions were pretextual, Mohamed alleges a pattern of discrimination on the part of Marriott. Noting that approximately fifty deaf people work at the Hotel, he points to the inadequacy of Collins as the sole interpreter and the Hotel's failure to replace Burns. He also alleges that hearing people are promoted to full-time status at the Hotel regularly, while deaf people are consistently passed over. Although a finder of fact could conceivably, on the meager facts presented so far, find a pattern of discrimination, such a pattern would in no way demonstrate that in this instance Marriott's reasons for termination were pretextual.

Therefore, no genuine issue of material fact is presented as to Mohamed's argument that Marriott discriminated in violation of the ADA through disparate treatment. The motion for summary judgment is thus granted for claims arising under the ADA from Marriott's disparate treatment.

### The Motions to Dismiss the Claims Under the New York State Human Rights and New York City Civil Rights Laws are Denied

The New York State Human Rights Law, Executive Law §§ 290 *et seq.*, substantially resembles the ADA. It states in pertinent part:

It shall be an unlawful discriminatory practice: (a) For an employer ..., because of the ... disability ... of any individual ... to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions, or privileges of employment.

New York Executive Law § 296. "Disability" is defined to include "a physical ... impairment resulting from anatomical, physiological or neurological conditions which prevents the exercise of a normal bodily function...." § 292(21).

■ As Marriott itself concedes, there is no difference between the quantum or elements of proof required by the ADA and the NYHRL. *See Sogg v. American Airlines, Inc.*, 193 A.D.2d 153, 603 N.Y.S.2d 21 (1st Dep't 1993); *Piekielniak v. New York State Dep't of Health*, 116 A.D.2d 839, 497 N.Y.S.2d 510 (3d Dep't 1986), *Swett v. Schenectady Community Action Program*, 107 A.D.2d 990, 484 N.Y.S.2d 711 (3d Dep't 1985); *Comfort v. New York State Human Rights Appeal Board*, 101 A.D.2d 663, 475 N.Y.S.2d 588 (3d Dep't 1984). Marriott has produced no authority that suggests that the analysis of Mohamed's claims under the substantially similar New York State statute should be analyzed differently from those levelled under the ADA. The motion for summary judgment with regard to the Human Rights Law claim is thus denied.

■ The New York City Civil Rights Law, New York City Administrative Code Title VIII, resembles both the ADA and the New York State Human Rights Law. That statute provides that:

It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the ... disability ... of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

New York City, New York Admin.Code § 8–107(1)(a) (Supp.1992). Further:

(a) Except as provided in paragraph (b), any person prohibited by the provisions of this section from discriminating on the basis of disability shall make reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job or enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity.

(b) In any case where the need for reasonable accommodation is placed in issue, it shall be an affirmative defense that the person aggrieved by the alleged discriminatory practice could not, with reasonable accommodation, satisfy the essential requisites of the job or enjoy the right or rights in question.

§ 8–107(15). "Handicapped person" is defined as "any person who has or had a physical or mental impairment that substantially limits one or more major life activities, and has a record of such an impairment." § 8–102(a). "Physical or mental impairment" includes "a physiological disorder or condition ... affecting ... special sense organs." § 8–102(16)(b). "Reasonable accommodation" is defined as "such accommodation that can be made that shall not cause undue hardship in the conduct of the covered entity's business. The covered entity shall have the burden of proving undue hardship." § 8–102(18). The statute sets out factors similar to those in the federal and state statutes in evaluating undue hardship. *Id.*

As Marriott notes, there is no difference between the rights granted under the New York City Civil Rights Law and those under the state or federal statute or the manner and amount of proof required. *Buckhout v. New York City Comm'n on Human Rights,* 203 A.D.2d 67, 609 N.Y.S.2d 608 (1st Dep't 1994). The wording of the city ordinance and the manner in which it has been applied show a clear intent to parallel the obligations and the remedies provided by the State of New York and the United States. *Pace Univ. v. New York City Comm'n on Human Rights,* 200 A.D.2d 173, 611 N.Y.S.2d 835 (1st Dep't 1994); *Buckhout,* 203 A.D.2d at 69, 609 N.Y.S.2d 608. Marriott has produced no authority that suggests that the analysis of Mohamed's claims under the substantially similar New York City statute should be analyzed differently from those levelled under the ADA and the New York State Human Rights Law. The motion for summary judgment with regard to the Human Rights Law claim is thus denied.

### The Motion to Dismiss the Claim for Intentional and Reckless Infliction of Emotional Distress is Granted

■ Mohamed's claim for "intentional and reckless infliction of emotional distress" is based chiefly on Collins' actions. Mohamed asserts that in testifying before a New York State unemployment insurance administrative tribunal, Collins refabricated the same story regarding Mohamed's credit card use as she had in the First Meeting. Further, Mohamed points to a post-termination meeting between Collins and Ray Falcone. During that meeting, which took place soon after the termination, Falcone, a Marriott employee, was in the process of negotiating with Ruth Lowenkron, who was helping Mohamed in an effort to return to his job. Mohamed alleges that during Collins' conversation with Falcone, she knowingly misrepresented Mohamed's story once again, repeating lies about the credit card problem. Mohamed also bases the intentional infliction of emotional distress claim on Marriott's failure to replace the services of Burns and on a failure to grant full-time work status to many deaf individuals.

■ Under New York law, the intentional infliction of emotional distress requires (1) an extreme and outrageous act by the defendant, (2) intent by the defendant to inflict severe emotional distress, (3) resulting severe emotional distress, and (4) that the distress be caused by the defendant's conduct. *Bower v. Weisman,* 639 F.Supp. 532, 541 (S.D.N.Y.1986) (Sweet, J.). That conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Martin v. Citibank, N.A.,* 762 F.2d 212, 220 (2d Cir.1985) (citing *Fischer v. Maloney,* 43 N.Y.2d 553, 402 N.Y.S.2d 991, 993, 373 N.E.2d 1215, 1217 (1978) (quoting Restatement (2d) Torts § 46(1)) (intentional infliction of emotional distress claim made in conjunction with claim for employment discrimination on account of race). Moreover, "the conduct must also be intentionally directed at the plaintiff and lack any reasonable justification. New York courts have been very strict in applying these principles." *Id.*

Mohamed has failed to meet New York's high standard. Marriott's behavior was not

so outrageous as to exceed the bounds of decency. As Mohamed himself notes, in the employment context, the bulk of instances in which claimants have prevailed in such actions have been in the case of sexual harassment. *O'Reilly v. Executone of Albany, Inc.,* 121 A.D.2d 772, 503 N.Y.S.2d 185 (3d Dep't 1986); *Koster v. Chase Manhattan Bank, N.A.,* 609 F.Supp. 1191 (S.D.N.Y.1985); *Collins v. Willcox, Inc.,* 158 Misc.2d 54, 600 N.Y.S.2d 884 (Sup.Ct.1992). In contrast, even overt acts of discrimination have generally not been found to rise to such a level. The court in *Martin* found no intentional infliction of emotional distress in the face of allegations that a worker was polygraphed regarding possible theft only because of her race, 762 F.2d 212, 220. In *Wanamaker v. Columbian Rope Co.,* 740 F.Supp. 127, 138 (N.D.N.Y.1990), the "humiliating and aggravating" actions leading up to an allegedly discriminatory termination failed to state a claim as a matter of law. Similarly, courts are loathe to find intentional infliction of emotional distress in employment-at-will situations. In *Sabatowski v. Fisher Price Toys,* 763 F.Supp. 705 (W.D.N.Y.1991):

> Plaintiff, an assembly line employee of defendant for more than fifteen (15) years, during a work break removed two toy Smooshies, worth about one dollar each, from the assembly line and placed them in a paper bag. Plaintiff insists that she never intended to steal the Smooshies, but only intended to place them on another assembly line as a joke. Shortly after placing the Smooshies in a bag, however, three of defendant's supervisory personnel confronted plaintiff about the Smooshies. Plaintiff did not deny taking the Smooshies.... As a result of the incident, two days later, defendant discharged plaintiff.

*Id.* at 707. The Court refused to let stand a contention that emotional distress was inflicted by plaintiff's being "forced and coerced into admitting a crime which [she] did not commit and hearing that she was to be made a 'scape goat' for missing merchandise and to be made 'an example of.'" *Id.* at 716. In *Loudon v. Hayek,* 756 F.Supp. 107 (S.D.N.Y. 1989), calling a terminated employee a "swindler" at a public meeting, blackballing him in his industry, and falsely telling unemploy-ment bureaus that he was not entitled to unemployment compensation failed to state a claim sufficient to survive a motion to dismiss.

Moreover, Marriott and Collins lacked the requisite intent. Even interpreting the facts as set forth in the light most favorable to Mohamed, Collins' actions were, at most, irresponsible. Mohamed has not supported his allegations that Collins purposely sought to cause emotional distress.

For these reasons, Marriott's motion for summary judgment is granted as to the claim for intentional and reckless infliction of emotional distress.

### The Motion to Dismiss the Claim for Loss of Services and Consortium is Granted

Mohamed's wife, Xiomara Amaya Mohamed, alleges that she has been deprived of the consortium of her husband, including his support, services, companionship, affection, society, physical relations and solace, and seeks to join as plaintiff in this action.

"Under New York law, a claim for loss of consortium or services is a derivative action and does not exist 'independent of the injured spouse's right to maintain an action for injuries sustained.'" *Milam v. Herrlin,* 819 F.Supp. 295, 306 (S.D.N.Y.1993) (Sweet, J.) (quoting *Jordan v. Lipsig, Sullivan, Mollen & Liapakis, P.C.,* 689 F.Supp. 192, 196 (S.D.N.Y.1988) (quoting *Liff v. Schildkrout,* 49 N.Y.2d 622, 427 N.Y.S.2d 746, 404 N.E.2d 1288 (1980))). Although a wife has a right to recover for loss of consortium, when "the husband's cause of action has been terminated either by judgment, settlement or otherwise, that should operate to bar the wife's cause of action for consortium." *Jordan,* 689 F.Supp. at 197 (quoting *Millington v. Southeastern Elevator Co.,* 22 N.Y.2d 498, 293 N.Y.S.2d 305, 239 N.E.2d 897 (1968).

Because there is no viable cause of action for intentional infliction of emotional distress, Xiomara's proposed action for loss of consortium survives only if it can successfully be appended to one of the three claims for alleged discrimination. It cannot be.

■ The loss of the consortium claim cannot be derived from Mohamed's claim based on the New York State Human Rights Law. Although the New York Court of Appeals has not addressed this issue, "[w]here the high court [of a state] has not spoken, the best indicators of how it would decide are often the decisions of lower state courts." *In re Brooklyn Navy Yard Asbestos Litig.,* 971 F.2d 831, 850 (2d Cir.1992) (citing *Commissioner v. Bosch's Estate,* 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967). The Appellate Division has repeatedly held that "the spouse of an employee alleging discrimination under the Executive Law is not a 'person aggrieved' within the meaning of the statute and a cause of action for loss of consortium cannot be stated under the Executive Law." *Mehtani v. New York Life Ins. Co.,* 145 A.D.2d 90, 537 N.Y.S.2d 800, 804 (1st Dep't 1989); *see also Rich v. Coopervision, Inc.,* 198 A.D.2d 860, 604 N.Y.S.2d 429 (4th Dep't 1993); *Belanoff v. Grayson,* 98 A.D.2d 353, 471 N.Y.S.2d 91, 94 (1st Dep't 1984).

■ The Courts have not spoken on this question with regard to the New York City ordinance. It uses parallel language, however, and thus we hold that a New York court would hold that no loss of consortium claim is derived from the New York City ordinance.

■ Finally, with regard to the ADA, the courts have not held whether a loss of consortium claim attaches. However, the statute empowering a private right of action under the ADA, 42 U.S.C. § 2000e–5, utilizes the identical language of a "person aggrieved" in referring to a claimant that New York courts have found denies a loss of consortium claim in state discrimination cases. The courts have found no right to a loss of consortium claim generally under Title VII. *See, e.g., Doe v. R.R. Donnelley & Sons Co.,* 843 F.Supp. 1278, 1283–84 (S.D.Ind.1994), *aff'd,* 42 F.3d 439 (7th Cir.1994); *Poree v. Lakewind East Apartments,* Civ. A. No. 93–3446, 1994 WL 705430 at *1 (E.D.La.1994); *Tauriac v. Polaroid Corp.,* 716 F.Supp. 672, 673–74 (D.Mass.1989); *see also Reed v. Johnson Controls, Inc.,* 704 F.Supp. 170 (E.D.Wis. 1989) (ADEA claim). Thus, no loss of consortium claim attaches to the ADA claim.

For these reasons, Marriott's motion for summary judgment is granted as to Xiomara's claim for loss of consortium.

### The Motion for Costs is Denied

Mohamed, citing Rule 56(g), requests an award of reasonable attorney's fees for answering this motion. Rule 56(g) provides:

> Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused the other party to incur, including reasonable attorney's fees....

Mohamed sets forth no facts, besides the decision of Marriott to file its motion for summary judgment, that suggest that Marriott has filed its motion either in bad faith or solely for the purpose of delay. The motion for costs is, therefore, denied.

### Rule 11 Sanctions Are Denied

■ Marriott and Mohamed have each urged us to sanction the other's counsel for Rule 11 violations. Marriott has further sought sanctions against Mohamed. Marriott asserts that sanctions are in order against Rich, Mohamed's attorney, because the pleadings he prepared requested damages exceeding the statutory amount permitted under the ADA, because the loss of consortium claim was filed in an untimely manner, and because certain opinions were misrepresented as facts. Mohamed asserts that sanctions are due against Marriott's counsel, Laurie Berke–Weiss, because of her demands for sanctions against Rich.

Rule 11 sanctions will not be imposed on either party or its counsel. The parties have raised legal issues sufficient to constitute a differing interpretation of the law. *Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006 (2d Cir.1986). Resolving ambiguities in favor of the filing party, *Oliveri v. Thompson,* 803 F.2d 1265, 1275 (2d Cir.1986), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987), the filings are not frivolous.

Both Mohamed's and Marriott's requests for Rule 11 sanctions are denied.

### Conclusion

For the reasons discussed above:

Mohamed's motion for leave to amend the complaint is granted.

Marriott's motion for summary judgment is granted in part and denied in part: specifically the motion is:

(1) denied as to the reasonable accommodation claim under the ADA, but granted as to the disparate treatment claim under the ADA;

(2) denied as to the claim under the New York State Human Rights Law;

(3) denied as to the claim under the New York City Administrative Code;

(4) granted as to the claim for intentional and reckless infliction of emotional distress;

(5) granted as to the claim for loss of consortium.

Mohamed's motion for costs is denied.

Marriott's motion for sanctions is denied.

Mohamed's motion for sanctions is denied.

It is so ordered.